## STATE OF MINNESOTA *vs.* DOW S. SMITH.

Argued June 4, 1894. Affirmed June 28, 1894.

Nos. 8728, 8780.

Constitutional law.

> Laws 1893, ch. 63, entitled "An act to compel street railway companies to protect certain of their employés from the inclemency of the weather," is constitutional.

Appeal by defendant, Dow S. Smith, from a judgment of the Municipal Court of the City of Minneapolis, *Stephen Mahoney*, J., entered January 19, 1894, adjudging him guilty of an offense under Laws 1893, ch. 63, and fining him $75.

There was also an appeal by defendant, Frank S. Hoskins, from a judgment of the Municipal Court of the city of St. Paul convicting him of a like offense.

On January 8, 1894, Dow S. Smith was superintendent and general manager of the Minneapolis Street Railway and on that day sent out the motoneer with electric car No. 505 without having provided it with an enclosure to protect him from exposure to the inclemencies of the weather, contrary to the provisions of Laws 1893, ch. 63. Smith was, on complaint of Charles E. Hultmark, arrested and plead not guilty, waived a jury, stipulated as to the facts and contended that the statute was unconstitutional. But he was found guilty and fined $75. He appeals to this court.

*Koon, Whelan & Bennett,* for appellant Smith.

*Munn, Boyeson & Thygeson,* for appellant Hoskins.

*H. W. Childs,* Attorney General, *Pierce Butler, Frank M. Nye* and *Albert H. Hall,* for the state.

GILFILLAN, C. J.    In these two cases the validity of Laws 1893, ch. 63, entitled "An act to compel street railway companies to protect certain of their employees from the inclemency of the weather," is called in question.

That act requires of street-railway companies operating electric, cable, or steam cars, requiring the constant service of persons on any part of the cars except the rear platform, to provide each car with an inclosure, constructed of wood, iron, and glass, or similar suitable material, sufficient to protect such employes from exposure to the inclemency of the weather, but not so as to obstruct the vision of the person operating the car, at all times between November 1st and April 1st in each year. What are called "trailing cars" are excluded from this requirement, so that it applies only to cars on which the motive power is operated or controlled.

The law was passed with reference to the fact that the man operating or controlling the motive power of such cars was required to stand where his person was almost wholly exposed to cold, storm, and wind, having but little protection except such as the clothing affords.

The act is assailed as unconstitutional, on the grounds—

First. That it is not an exercise of the police power of the state.

Second. It is class legislation.

Third. It impairs the obligation of a contract.

Fourth. It interferes with the liberty of contract between street-railway companies and their employes.

Fifth. It imposes an excessive fine.

It is stipulated as a fact, what everybody knows, that electric cars are run at a rate of speed of from four to fifteen miles an hour, and at an average rate of between eight and nine miles an hour.

Any one acquainted with the extreme cold of much of the weather in this climate between the 1st of November and the 1st of April, and who knows, as everybody does, that the motorman on an electric car is obliged to stand in one place, always on the alert, his whole attention given to the means of controlling the motive power and the brake, and to looking out ahead, and unable, with due regard to his duties, to give attention to protecting himself from the cold, must appreciate that, when going at the rate of eight or nine miles an hour, perhaps against a head wind, and with the mercury below zero, the position of the motorman is one not merely of discomfort, but of actual danger to health, and sometimes to life, and the tendency of which is to disable him to some extent to perform his duties in the way that care to safety of his passengers and of travelers on the streets requires.

It has never been questioned that the police power of the state extends to regulating the use of dangerous machinery, with a view to protecting, not only others, but those who are employed to use it; and if it be conceded, as it must be, that the state may intervene by regulations in such a case, we do not see why it may not in such a case as this.

The act is within the police power.

When a subject is within that power, the extent to which it shall be exercised, and the regulations to effect the desired end, are generally wholly in the discretion of the legislature. The legislature might in this case have required the use of the prescribed inclosure only at such times when the cold reached a certain degree, or when storms prevailed, but it was thought fit to make sure of the result aimed at by covering the time of year when extreme cold and bitter storms may occur at any time; and that was within its exclusive province.

The objection that this is class legislation is based on the fact that the act is confined to street cars propelled by cable, steam, or

electricity, and does not include street cars drawn by mules and horses, or carriages or wagons; and it is assumed that here is an attempt at purely arbitrary classification for the purpose of the act.

The evil sought to be remedied does not exist in case of the slowly-going mule or horse car, or carriage or wagon, to the same degree as in the case of cable, electric, or steam cars.

But, where an evil exists in a variety of cases, it is a sufficient ground for classification in legislating, so as to include some and exclude others, that in the former the evil can be remedied, while in the latter it cannot be.

The man in control of the cable, electric, or steam railway car may be boxed in without impairing his power of control in the slightest degree; but to box in the driver of a horse or mule car, or of a stagecoach or carriage or wagon, separating him from his animals, while of course it could be done, would bring about greater evils than those sought to be remedied. The difference in this respect between cars included in this act and those not included is such as to justify difference in legislating.

The claim that the act impairs the obligation of a contract is based on the fact that in each case the railway company had a contract with the city, made before the passage of the act, in which the former bound itself to run cars of "the best modern style and construction," and this act requires something in addition thereto.

We need only say of that, where parties contract on matters within the police power of the state, they do so subject to the exercise of that power whenever the legislature chooses to exercise it. If one contract with the state or a municipal corporation, acting under authority of the state, even if it were conceded that the legislature can, by contract or by giving authority to make a contract, bind the state not to exercise the police power, the legislative intent to do so would have to appear unmistakably. There is nothing to suggest such intent in the charter of either city.

What we have said on the third point made by appellants applies with equal force to the fourth.

The act imposes a fine of not less than $50, nor more than $100, for a violation of the law, and makes each day that cars shall be run without complying with the law a separate offense. A fine of

from $50 to $100 could not be called excessive. It is true the party may, by repeatedly committing the offense, add up a large aggregate of fines; so might the offender against any other law,—the law against larceny or embezzlement, or any other; but that would not make the punishment excessive.

Judgments affirmed.

COLLINS and BUCK, JJ., took no part in the decision.

(Opinion published 59 N. W. 545.)