THE STATE, BORDEN'S CONDENSED MILK COMPANY, PROSECUTOR, v. THE BOARD OF HEALTH OF THE TOWN OF MONTCLAIR, DEFENDANT.

Argued April 17, 1911—Decided June 6, 1911.

1. Boards of health are empowered by the act of 1897 (*Pamph. L., p.* 270), and by the Pure Food law of 1907 (*Pamph. L., p.* 485), taken in conjunction with the act of 1887 (*Pamph. L., p.* 80), to prohibit the sale of milk from diseased cows.
2. Whether cows from which a municipality is supplied with milk are diseased, is a question that may in the first instance be determined by the local board of health.
3. In determining whether cows from which a municipality is supplied with milk are diseased, the method of diagnosis adopted by the local board of health should be one that is well recognized, thoroughly approved, and as reliable as any.
4. A local board of health may prohibit the sale within the municipality of milk from cows that react to the "tuberculin test."
5. The action of a local board in adopting measures for the protection of public health will not be set aside by the court if the board has acted reasonably upon evidence that might satisfy a reasonable man.
6. Regulations for the protection of the public health are within the police power of the state and are not an illegal interference with interstate commerce if they have a real substantial relation to a public object which government can accomplish, and are not arbitrary and unreasonable and beyond the necessities of the case.

On *certiorari.*

Before Justices SWAYZE, BERGEN and MINTURN.

For the prosecutor, *Charles D. Thompson* and *Gilbert Collins* (*Richard V. Lindabury, George L. Nichols, William M. Chadbourne, Sinclair Hamilton,* on the brief).

For the defendant, *Edwin B. Goodell* and *Edward M. Colie:*

The opinion of the court was delivered by

SWAYZE, J. The prosecutor seeks to set aside a portion of article 8 of the sanitary code of Montclair, relating to milk

and its production. The portion of which he complains reads as follows: "No milk shall be sold or offered for sale or distributed in the town of Montclair except from cows in good health, nor unless the cows from which it is obtained have within one year been examined by a veterinarian whose competency is vouched for by the State Veterinary Association of the state in which the herd is located, and a certificate signed by such veterinarian has been filed with the board of health, stating the number of cows in each herd that are free from disease. This examination shall include the tuberculin test, and charts showing the reaction of each individual cow shall be filed with this board. All cows which react shall be removed from the premises at once, if the sale of milk is to continue, and no cows shall be added to a herd until certificates of satisfactory tuberculin tests of said cows have been filed with this board.

"The board of health may, from time to time, when in its opinion the public interest may require, permit, by resolution, the sale of milk that is produced under conditions other than as herein specified, provided that such milk is pasteurized by subjecting it to a temperature of 150° F. for twenty minutes, or by an equivalent process.

"No cream shall be sold, exposed for sale or delivered within the town of Montclair, unless it be produced and handled in accordance with the requirements hereinbefore set forth for the production and handling of milk."

The effect of these provisions is to exclude from sale in the town of Montclair milk and cream regardless of whether in fact it is good and wholesome and regardless of the condition of the cows, if they cannot pass what is called the tuberculin test, except where the board of health by special permission allows milk to be sold after it has been pasteurized. The prosecutor is a large dealer in that town and obtains its supply from special herds of cattle in Chenango county, New York. It cannot induce the farmers from whom it obtains the supply for Montclair to submit their cows to this test. It is claimed that the effect of the ordinance will be to compel the prosecutor to withdraw from the business of vending milk in the town.

The question is, whether it is a legal exercise of power by the board of health to require the use of the tuberculin test upon cows as a condition for the sale of milk in Montclair.

The power of the board of health is to be found in the act of April 23d, 1897 (*Pamph. L., p.* 270), section 2 of which was amended by the act of April 21st, 1898. *Pamph. L., p.* 429. This legislation is more recent than the act printed in the General Statutes, on page 1644, and is more specific in its terms. Section 3, paragraph 6 of the Pure Food law of 1907 enacts that a food shall be deemed to be adulterated if it is the product of a diseased animal (*Pamph. L.* 1907, *p.* 486), and the local board of health by the original act of 1887 (*Pamph. L., pp.* 80, 86) is empowered to pass ordinances and make rules and regulations to aid in the enforcement of the law as to the adulteration of all kinds of food and drink. Section 8 of the act of 1907 (*Pamph. L., p.* 489) is obviously an addition to and not a substitute for the earlier legislation and section 3, paragraph 6 of the same act. The effect of these statutes, as far as applicable, seems to be the same. The first section of the act of 1897 authorizes a local board of health to prohibit the sale of milk produced from diseased cows. The statute is silent as to the method by which the existence of disease is to be determined. The fact, on which the right of the board to act, depends, is or may be a matter of opinion or inference on which experts may disagree. Since no other tribunal is provided, the natural inference is that this question should in the first instance be determined by the board, which is the body called upon to act. *Valentine* v. *Englewood,* 47 *Vroom* 509. The board of health must necessarily decide this jurisdictional fact, and determine whether or not it has jurisdiction, just as in *Grove* v. *Van Duyn,* 15 *Id.* 654, the justice of the peace was required to do. This is not denied by the prosecutor. What the prosecutor complains of is that the sanitary code of Montclair makes the right to sell milk depend not upon the fact of the existence of disease in the cow, but upon the result of a specific method of diagnosis—the use of the tuberculin test. It must be conceded that where, as in this case, the board of health makes the determination of the exist-

ence of disease depend upon a special method of diagnosis, that method must be, if not the most reliable, as reliable as any. The existence of disease is necessarily to some extent a matter of opinion or inference from established facts. The most skillful veterinarian may err. The most reliable symptoms may be deceptive, and absolute accuracy in diagnosis cannot be looked for. To demand it is a counsel of perfection not adapted to the exigencies of everyday life. Perfection of that degree is not attained under the diagnosis of human diseases where the physician has the advantage of a patient able to state subjective symptoms and give a history of the complaint. All that can be fairly required in the determination of the fact of disease, is that the method of diagnosis should be well recognized, thoroughly approved and as reliable as any. We find that the tuberculin test is the most reliable method of diagnosis of tuberculosis in cattle now known; that while it is not perfect the percentage of error is as small as in any method suggested; and that it is more accurate than the method by physical examination. We rest this conclusion not merely upon the testimony in the case, but upon the fact that it has been approved by judicial decision in Minnesota, Louisiana, Wisconsin and Pennsylvania. *State* v. *Nelson,* 66 *Minn.* 166; *Nelson* v. *Minneapolis,* 112 *Id.* 16; *City of New Orleans* v. *Charoulean,* 121 *La.* 890; *Adams* v. *Milwaukee,* 129 *N. W. Rep.* 518; *Limber* v. *Meadville,* in Crawford Common Pleas, Pennsylvania, and adopted by the most recent statute in Delaware, Indiana, Maryland, Michigan, Minnesota, New Mexico, North Dakota, Oregon, Pennsylvania, South Carolina, Tennessee, Washington and Wisconsin, and for some purposes by Maine, Massachusetts and Vermont. The "tuberculean test" referred to in the act of South Dakota is probably the same. A similar act was passed by our own legislature in 1899. *Pamph. L., p.* 484. These statutes are legislative testimony of cumulative force to the value of the tuberculin test as a diagnostic agent. We think, therefore, that the board of health is justified in the position that cattle which react to the tuberculin test are diseased. That conclusion may occasionally be erroneous, but it is as nearly accurate as is possible. The

statute empowers the board of health to prohibit the sale of milk from such cattle.

It is objected that the ordinance goes farther than is necessary for the protection of the public, and hence farther than is warranted by any power that can be given by a statute that by its title relates only to health. We do not accede to this argument. To protect the public against danger from impure milk, some practicable method of ascertaining its impurity must be devised. One of the most serious dangers that may arise is the spread of an infectious or communicable disease, such as tuberculosis is declared to be by the act of 1909. *Pamph. L., p.* 421. The argument is that the danger of communication of tuberculosis by means of milk is so slight as to be negligible, and the tuberculin test is therefore unnecessary; that it is not a sufficiently accurate method of determining the quality of milk to justify condemnation on no other ground than that the cows react to the test. Scientific men who have made a study of the subject are not agreed as to the probability of the communication of tuberculosis from cattle to man by means of milk and the seriousness of the danger. It seems to be established that there is very little chance of communication of bovine tuberculosis to human beings above the age of sixteen years, but that there is very serious danger of communication through the medium of milk to human beings under sixteen years of age, and especially to children under five years of age. It is conceded that there are such cases. The concession that bovine tuberculosis may be communicated to young children, and that although it appears in them in the less common forms rather than in the form of pulmonary tuberculosis, suffices to justify action to guard the young against the contagion. It is for the board of health to decide how many lives must be endangered, and whether the lives of a few infants or children are worth the effort and the financial loss. To suggest these considerations is to answer them. If the life of one child is endangered, extreme prudence may be proper. To secure protection to the young at any rate, it is necessary to adopt some method of determining whether or

not milk exposed for sale is contaminated with the germs of tuberculosis. Probably the best, perhaps the only thorough way of determining the character of the milk is by a bacteriological examination of the milk itself, but this process is impracticable. It requires the use of high power microscopes, with which it is impossible to examine at any time more than an infinitesimal portion of the milk, and that portion may or may not be a fair sample of the whole bulk, while to examine specimens enough to reach a fair average requires so much time that a commodity as perishable as milk would spoil while being tested. We cannot say that in adopting the tuberculin test, the board of health exceeded its legitimate function. That function is distinct from the function of the court. The decision of a particular question, especially one of expert scientific opinion, is more properly entrusted to an administrative tribunal. In the case of assessments for benefits for a municipal improvement the court does not review the judgment of the commissioners as to the extent of the benefit if there was evidence upon which a reasonable man might have reached the same result. In considering a case on appeal from a District Court or on a writ of error, we do not ourselves pass upon the question of fact involved, but we accept the finding of the lower court or jury as conclusive if there was any evidence to warrant it. The same principle applies to an administrative body like a board of health, and if it acts reasonably upon evidence that might satisfy a reasonable man, we ought not to disturb its action even if our minds are led to a different result. We do not say that we would have reached a different result in the present case. The evidence justifies a finding that the subjection of the cows from which a supply of milk is derived to the tuberculin test is a reasonable method of determining not only whether they are diseased but also whether their milk may carry the germs of tuberculosis. If the cows are diseased, the milk is by statute pronounced adulterated, and whether in fact it is wholesome or not can only be of importance in considering the constitutionality of the legislation, a topic to which we shall recur. *Shivers* v. *Newton,* 16 *Vroom* 469. That the ordinance is not necessarily oppressive is

proved by the ready compliance therewith by the other milk dealers in Montclair.

We are not impressed by the suggestions that healthy cows may, and diseased cows may not, react to the tuberculin test, that many cows react that have had tuberculosis and recovered, that many that now have tuberculosis are likely to recover, and that it is possible for the producer of milk to destroy the value of the test by trick. These arguments would be of more importance if the board of health were undertaking to condemn to death all cattle that react. This they are not doing. If the cattle are likely to recover, the owner may keep them until they do, and may use their product for any proper purpose. His loss is similar in kind, although perhaps greater in degree than the loss of milk at the time of parturition. If the cows are in fact free from tuberculosis, or have already recovered, he could no doubt make a market for his milk upon establishing those facts. Provision is made for special cases by section 7 of article 8 of the sanitary code. The fact that the value of the test may be destroyed by the trick of the owner of the cow only shows that the method is not perfect; few methods could be beyond the reach of possible deception. It is beside the point to suggest that if this test were applied to human beings, eighty per cent. of mankind must be condemned as diseased. In dealing with human beings a different rule is followed from that which is applied in dealing with cattle, because men make the rule. The test might be applicable to human beings if it were proposed to use the produce of their bodies as food for others. A wet nurse might properly be subjected to a more stringent examination.

The most important question raised in this case, and certainly one of the most difficult, is that which relates to the validity of this legislation under the federal constitution. We do not stop to consider whether the method adopted by the prosecutor for shipping milk from New York to New Jersey was such as to bring it within the rule of *Leisy* v. *Hardin*, 135 U. S. 100, or the later rule of *Austin* v. *Tennessee*, 179 *Id.* 343. We prefer to deal with the more fundamental question. It must be conceded that the statute and the ordinance, as we

construe them, deprive the prosecutor of property, and may in a probable case interfere with interstate commerce, even if the present case, like Austin *v.* Tennessee, does not involve a shipment in original packages. The right to enact such legislation must be rested upon the police power of the state. We need not review the numerous cases upon this subject. We content ourselves with a reference to some of the more recent cases and some more precisely in point. One of the most important is *Jacobson* v. *Massachusetts,* 197 *Id.* 11, which involved the constitutionality of the Compulsory Vaccination act of Massachusetts. It was urged that scientific men were not agreed as to the value of vaccination as a preventative of smallpox, and that vaccination sometimes produced worse diseases than it prevented and frequently operated to the detriment of the individual. The argument was similar to that already adverted to against the tuberculin test; but the court said that the legislature was not compelled to submit a matter involving the public health and safety to the final decision of the court or jury. "It is no part of the function of a court or jury," said Mr. Justice Harlan, "to determine which one of two modes was likely to be the most effective for the protection of the public against disease. That was for the legislative department to determine in the light of all the information it had or could obtain. It could not properly abdicate its function to guard the public health and safety. The state legislature proceeded upon the theory which recognized vaccination as at least as effective if not the best known way in which to meet and suppress the evils of a smallpox epidemic that imperiled an entire population. Upon what sound principles as to the relations existing between the different departments of government can the court review this action of the legislature? If there is any such power in the judiciary to review legislative action in respect of a matter affecting the general welfare, it can only be when that which the legislature has done comes within the rule that if a statute purporting to have been enacted to protect the public health, the public morals or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of

rights secured by the fundamental law, it is the duty of the courts to so adjudge and thereby give effect to the constitution." "The defendant offered to prove that vaccination quite often caused serious and permanent injury to the health of the person vaccinated; that the operation occasionally resulted in death; that it was impossible to tell in any particular case what the result of vaccination would be or whether it would injure the health or result in death; that quite often one's blood is in a certain condition of impurity when it is not prudent or safe to vaccinate him; that there is no practical test by which to determine with any degree of certainty whether one's blood is in such condition of impurity as to render vaccination necessarily unsafe or dangerous; that vaccine matter is quite often impure and dangerous to be used, but whether impure or not cannot be ascertained by any known practical test; that the defendant refused to submit to vaccination for the reason that he had when a child been caused great and extreme suffering for a long period by a disease produced by vaccination; and that he had witnessed a similar result of vaccination not only in the case of his son but in the cases of others." The case that Jacobson offered to make against the propriety of vaccinating him was much stronger than the case made by the prosecutor against the use of the tuberculin test for cattle, especially in view of the fact that the health authorities in the Jacobson case were dealing with a human life. Yet the court said that the offer of evidence "in effect invited the court and jury to go over the whole ground gone over by the legislature when it enacted the statute in question," and that "while this court should guard with firmness every right appertaining to life, liberty or property, as secured to the individual by the supreme law of the land, it is of the last importance that it should not invade the domain of local authority except when it is plainly necessary to do so in order to enforce that law." This case has recently been cited and relied upon as authority by the Court of Errors and Appeals in an action where the board of health went further than to enact a general regulation, as in the present case, and actually interfered with a man's liberty and property, because in

their opinion there was danger of the spread of scarlet fever. *Valentine* v. *Englewood,* 47 *Vroom* 509. Since the decision of Jacobson *v.* Massachusetts, the United States Supreme Court has sustained an ordinance of San Francisco granting a sole and exclusive right for fifty years to cremate and destroy within that city and county house refuse, dead animals and the like. The effect of the ordinance was to deprive scavengers of their occupation. It was, however, sustained, and the court declared it to be well settled that if a regulation enacted by competent public authority avowedly for the protection of the public health has a real, substantial relation to that object, the courts will not strike it down upon grounds merely of public policy or expediency. *Reduction Company* v. *Sanitary Works,* 199 *U. S.* 306. Ordinances of a similar character in the city of Detroit were also sustained. *Gardner* v. *Michigan, Id.* 325. We have followed these cases. *Atlantic City* v. *Abbott,* 44 *Vroom* 281. In *Laurel Hill Cemetery Co.* v. *San Francisco,* 216 *U. S.* 358, an ordinance prohibiting burial of the dead within the limits of a populous city, based upon a determination of the city authorities that the practice was dangerous to life and detrimental to public health, was sustained, although it prevented the sale for cemetery lots of property worth $75,000, and the cemetery company offered to prove that its cemetery was in no way harmful, and that the popular belief was a superstition. Mr. Justice Holmes said: "It may be in a matter of this kind, where the finding of fact is merely a premise to laying down a rule of law, that this court has power to form its own judgment without the aid of a jury. But whatever the tribunal, in questions of this kind, great caution must be used in overruling the decision of the local authorities or in allowing it to be overruled." If the present ordinance is tried by the test applied to these cases, we think it must be said that the means employed by the board of health have a real, substantial relation to a public object which government can accomplish, and that the ordinance is not arbitrary and unreasonable and beyond the necessities of the case. The line of cleavage between what is permissible and what is not, is illustrated by the difference between Jacobson *v.*

Massachusetts and *Wong Wai* v. *Williamson*, 103 *Fed. Rep.* 1. In that case the court pronounced unconstitutional a regulation of the San Francisco board of health providing that no Asiatic or Chinese should depart from the city without being inoculated with a certain serum used as a prophylactic. Obviously, it was of no importance to the health of San Francisco that one who was departing for another place should be protected against a future attack of bubonic plague. San Francisco might protect itself against the introduction of disease, but it was not for that city to undertake the protection of other municipalities. The United States Supreme Court has also had to deal with questions of a similar character affecting the quarantine of cattle, and the prosecutors rely upon *Railroad Company* v. *Husen*, 95 *U. S.* 465. But that case was decided upon the ground that the statute held invalid, prevented the entry into Missouri, at certain seasons of the year, of any Texas, Mexico or Indian cattle whatever. Later, when a similar question arose under the action of the authorities of Texas, prohibiting the entry into the state of cattle, mules or horses from Louisiana, the action of the authorities was sustained. The court said that the validity of the action "depends upon whether the police power of the state has been exerted beyond its provisions—exerted to regulate interstate commerce—exerted to exclude without discrimination the good and the bad, the healthy and the diseased, and to an extent *beyond what is necessary for any proper quarantine*. The words in italics express an important qualification. The prevention of disease is the essence of a quarantine law. Such law is directed not only to the actually diseased but to what has become exposed to disease." *Smith* v. *St. Louis and South Western Railway*, 181 *Id.* 248. This is very near to the present case, for surely milk from cattle that react to a tuberculin test has been exposed to disease, and if the cattle themselves may be kept out of the state, it is fairly within the discretion confided in boards of health to exclude also milk, the produce of the cattle, which it is proved may at times convey the disease.

The cases above cited establish that, great as is the power confided in boards of health, it must stop short of arbitrary action, and the means must bear some reasonable relation to the protection of public health. The Montclair board has been careful to avoid arbitrary action. It has postponed for the benefit of the prosecutor the time when the ordinance should become effective in order that the Borden company might get the farmers, from whom it derives its milk, to comply. The board has apparently sought to be fair to the producers as far as consistent with its own view as to the danger of the transmission of tuberculosis from cows that react to the tuberculin test. With this end in view, it adopted section 7 of article 8 of the sanitary code, permitting under certain circumstances the sale of milk produced under conditions other than those specified in the ordinance, provided that it be pasteurized. The prosecutors object to this provision of section 7. In view of our holding that section 5 must be sustained, it can hardly be argued that the provision of section 7 is bad, for if section 5 is good, the board of health was under no obligation to relax it in even the slightest degree, and the possibility of modifying the rule under certain conditions is wholly to the advantage of the prosecutor. It was obviously intended to be so and to prevent the milk from being a total loss, provided it was to the satisfaction of the board of health rendered innocuous.

We think the ordinance in question is valid, and that the writ of *certiorari* should be dismissed, with costs. The prosecutor may desire to sue out a writ of error, and in order that it may, if it thinks advisable, apply to the Court of Errors and Appeals for a stay, judgment is not to be entered in this court until June 21st.