# STATE OF NORTH DAKOTA v. ARMOUR & COMPANY, a Corporation.

### (— L.R.A. (N.S.) —, 145 N. W. 1033.)

As early as chapter 72, Sess. Laws 1899, North Dakota has each year enacted legislation upon the subject of pure foods and honest weights and measures. The 1907 act provides that every package, bottle, or container should bear the true net weight of the product. Chapter 236, Sess. Laws 1911, provides that every article of food or beverage as defined in the statutes of this state shall be sold by weight, measure, or numerical count, and labeled in accordance with the provisions of the laws of this state; that all weights shall be net, excluding the wrapper or container, and that every lot of lard, lard compound, or lard substitute, unless sold in bulk, shall be put up in pails or containers holding 1, 3, or 5 pounds net weight or some whole multiple of these numbers, and not any fraction thereof. Defendant is a corporation having packing houses in Chicago, Omaha, and other large cities, and maintaining a branch establishment in the city of Fargo, North Dakota, to which its goods are shipped in carload lots to be distributed therefrom. In October, 1911, the state food commissioner went to this branch establishment in Fargo and asked to purchase 3 pounds of lard. He was sold a pail containing 2 pounds and 6 ounces. The sale and the resultant arrest were made to test the constitutionality of the 1911 law. The defendant claimed that the law was unconstitutional for seven reasons, the first reason being subdivided into six parts.

**Unconstitutional law — arbitrary — legislature — courts — interference — burden on person attacking law — beyond reasonable doubt — prejudice — profit to middleman — weights and measures.**

1. Plaintiff's contention is that the law is unconstitutional because it is arbitrary, unreasonable, and not justified under the police powers of the state. (a) It is contended that the 1911 law was unnecessary because the 1907 law providing for the display of net weights was ample to protect the consumer against fraud. *Held*, that the legislature has primarily the choice of laws regulating weights, and the court will not interfere with this choice. The burden is upon the person attacking the constitutionality of the law to show beyond a reasonable doubt that the Constitution has been violated, that in the case at bar the defendant has failed in his proof, there being many reasons for the 1911 enactment. (b) It is contended that the law is unreasonable because

---

Note.—On the general question of the power to require weight of package to be indicated upon it, see note in 17 L.R.A. (N.S.) 684. And as to the constitutionality of discriminations in statutory regulations concerning food products, see note in 54 L.R.A. (N.S.) 650.

it interferes with a custom of the lard industry extending over a period of more than thirty years. *Held*, that this is no objection to the law. The fact that an abuse has existed for thirty years does not foreclose the state from an attempt to regulate the same. (c) It is contended that the law is unreasonable because it imposes an additional expense upon the packers. *Held*, upon an examination of the evidence, that this contention is not well founded. The defendant is already supplying a private firm with net-weight pails that would comply with the laws of North Dakota. No reason is shown why those pails could not be lithographed with the Armour brand and used in North Dakota. (d) It is further urged that the law is unnecessary and unreasonable because in any event the customers are not prejudiced. That they are paying merely the price of bulk lard plus the extra expense of the tin pails. *Held*, upon an examination of the evidence, that the consumer pays more than the mere cost of the container. This cost includes expensive advertising upon the pail itself, and a probable profit to the middlemen upon the cost of the pail as well as of the lard. (e) It is urged that the law is unreasonable as interfering with the regular custom of all trades, it being contended that butchers and grocers include the weight of the paper bag with the goods sold. *Held*, that even if true it furnishes no reason why laws should not be enacted to regulate this abuse. (f) It is contended that the enforcement of this law will drive the packers to use bulk lard only, to the detriment of the commodity. *Held*, that from the evidence, the packers never furnished over 40 per cent of the lard to the trade in this state, and this defendant furnishes but between 5 per cent and 10 per cent of the lard used, and even should it withdraw from the state it would not materially affect the lard industry. The authorities upon the subject of the control of weights and measures by compelling even weights in containers are collected in the opinion.

**Constitutional guaranties — freedom of contract — equal protection — police power — private rights — public — protection.**

2. The law of 1911 does not interfere with the guaranties of the Constitution relative to the right of freedom of contract and the equal protection of the law. Under the police power, the state can interfere with private rights when necessary to protect the public from fraud or the opportunity for fraud. Whatever injury one particular citizen may suffer is compensated to him by the general protection afforded him against other evils, by such police power.

**Due process of law — taking of property without.**

3. Said statute does not constitute the taking of property without due process of law.

**Lard industry — other articles of food — fraud — sale of foods.**

4. The claim of appellant that the lard industry is singled out from all articles of food, and subjected to regulation, is not supported by the evidence in this case. Every article of food or beverage, as well as ordinary articles of commerce, such as paints, formaldehyde, Paris green, etc., are regulated by

the same or similar acts. The 1911 law specifically mentions lard, lard compounds, and lard substitutes, and the manner of their regulation in pails, but this is a mere incident of the law. The object of the law is to prevent the opportunity for fraud in the sale of all articles of food.

## Commerce clause — Federal Constitution — original package — sale local or intrastate.

5. The claim of the defendant that the law is in violation of the commerce clause of the Federal Constitution is not sustained. Congress has control of commerce between the several states, with foreign nations and among the Indian tribes, while the states have control over intrastate commerce. The pail of lard sold to the food commissioner was shipped into the state in a railway car, and was itself contained in a crate containing 20 similar pails. The original package was either the railway car or the crate, and had been broken prior to the sale. Thus the sale was a local or intrastate transaction. The cases upon this phase are collected in the opinion.

## Interpretation — gross weights — repeal by judicial construction — courts.

6. It is contended by defendant that the act should be given a reasonable interpretation, thus permitting the sale of gross-weight pails if labeled with the net weight. *Held,* that the import of the law is plain, and that the construction required by the defendant would result in a repeal of the law by judicial construction, which this court will not do.

## Congress — foods — weights — sale — intrastate — control of.

7. It is contended that Congress has assumed control of the field of pure foods and weights, and therefore the laws of North Dakota upon the subject have become ineffectual. Under the fifth paragraph of this opinion it is held that the sale in question was an intrastate transaction, entirely within the control of the state, and entirely outside of the control of the United States.

Upon consideration of the whole act it is held that the law is not unreasonable, and it in no manner prejudices the defendant, and is not in conflict with any of the enumerated provisions of the Constitution.

Opinion filed December 17, 1913. On petition for rehearing, February 17, 1914.

Appealed from the District Court of Cass County, *Pollock,* J.
Affirmed.

*Watson & Young* and *Alfred R. Urion* and *Abram R. Stratton,* for appellant.

Every exercise of the police power must be *reasonable.* Wisconsin M. & P. R. Co. v. Jacobson, 179 U. S. 287, 45 L. ed. 194, 21 Sup. Ct. Rep. 115; Plessy v. Ferguson, 163 U. S. 537, 41 L. ed. 256, 16 Sup. Ct. Rep. 1138; Railroad Commission Cases, 116 U. S. 307, 29 L. ed. 636,

6 Sup. Ct. Rep. 334, 388, 1191; Reagan v. Farmers' Loan & T. Co. 154 U. S. 362, 38 L. ed. 1014, 4 Inters. Com. Rep. 560, 14 Sup. Ct. Rep. 1047; Covington & L. Turnp. Road Co. v. Sandford, 164 U. S. 578, 41 L. ed. 560, 17 Sup. Ct. Rep. 198; Lake Shore & M. S. R. Co. v. Smith, 173 U. S. 684, 43 L. ed. 858, 19 Sup. Ct. Rep. 565.

While every reasonable presumption is to be indulged in favor of the validity of a statute, the courts must obey the Constitution, rather than the lawmaking branch of the government. Mugler v. Kansas, 123 U. S. 623, 31 L. ed. 205, 8 Sup. Ct. Rep. 273; Sinking Fund Cases, 99 U. S. 700, 718, 25 L. ed. 496, 501; Marbury v. Madison, 1 Cranch, 137, 176, 2 L. ed. 60, 73; Powell v. Pennsylvania, 127 U. S. 678, 32 L. ed. 253, 8 Sup. Ct. Rep. 992, 1257; Dobbins v. Los Angeles, 195 U. S. 223, 49 L. ed. 169, 25 Sup. Ct. Rep. 18; Lawton v. Steele, 152 U. S. 133, 38 L. ed. 385, 14 Sup. Ct. Rep. 499; Wisconsin M. & P. R. Co. v. Jacobson, 179 U. S. 287, 45 L. ed. 194, 21 Sup. Ct. Rep. 115; Lochner v. New York, 198 U. S. 45, 49 L. ed. 937, 25 Sup. Ct. Rep. 539, 3 Ann. Cas. 1133; Plessy v. Ferguson, 163 U. S. 550, 41 L. ed. 260, 16 Sup. Ct. Rep. 1138; State v. Hanson, 118 Minn. 85, 40 L.R.A. (N.S.) 865, 136 N. W. 412, Ann. Cas. 1913E, 405; Freund, Pol. Power, p. 60.

Section two of the law can be justified only on the basis that it is necessary to prevent fraud. It is in violation of the commerce clause of the Federal Constitution. McDermott v. Wisconsin, 228 U. S. 115, 57 L. ed. 754, 47 L.R.A.(N.S.) 984, 33 Sup. Ct. Rep. 431.

The object of the act in question is to prevent the misuse of the facilities of interstate commerce in conveying to and placing before the consumer misbranded and adulterated articles of medicine or food. Re Wilson, 168 Fed. 566; Nave-McCord Mercantile Co. v. United States, 104 C. C. A. 486, 182 Fed. 46; United States v. American Druggists' Syndicate, 186 Fed. 387; United States v. 10 Barrels of Vinegar, 186 Fed. 400; Von Bremen v. United States, 113 C. C. A. 296, 192 Fed. 904; United States v. 75 Boxes of Alleged Pepper, 198 Fed. 934.

It is well settled that the state may not, under the guise of police power, impose burdens upon or discriminate against interstate commerce, nor enact laws in conflict with the statutes of Congress. Texas & P. R. Co. v. Abilene Cotton Oil Co. 204 U. S. 426, 51 L. ed. 553, 27 Sup. Ct. Rep. 350, 9 Ann. Cas. 1075; Northern P. R. Co. v. Wash-

ington, 222 U. S. 370, 56 L. ed. 237, 32 Sup. Ct. Rep. 160; Southern
R. Co. v. Reid, 222 U. S. 424, 56 L. ed. 257, 32 Sup. Ct. Rep. 140;
Second Employers' Liability Cases (Mondou v. New York, N. H. &
H. R. Co.) 223 U. S. 1, 56 L. ed. 327, 38 L.R.A.(N.S.) 44, 32 Sup.
Ct. Rep. 169, 1 N. C. C. A. 875; Savage v. Jones, 225 U. S. 501, 56
L. ed. 1182, 32 Sup. Ct. Rep. 715.

The classification contained in § 2 is arbitrary and without reason,
and cannot be justified as a proper exercise of police power. Edmonds
v. Herbrandson, 2 N. D. 270, 14 L.R.A. 725, 50 N. W. 970; Vermont
Loan & T. Co. v. Whithed, 2 N. D. 82, 49 N. W. 318; Angell v. Cass
County, 11 N. D. 265, 91 N. W. 72; Beleal v. Northern P. R. Co.
15 N. D. 318, 108 N. W. 33, 20 Am. Neg. Rep. 453; Plummer v.
Borsheim, 8 N. D. 565, 80 N. W. 690; Re Connolly, 17 N. D. 551,
117 N. W. 946; State ex rel. Dorval v. Hamilton, 20 N. D. 598, 129
N. W. 916; Powers Elevator Co. v. Pottner, 16 N. D. 359, 113 N. W.
703; Wally v. Kennedy, 2 Yerg. 554, 24 Am. Dec. 511.

The limitation of legislative power to classify is that it shall be
upon some reason suggested by necessity, or by a difference in the
situation and circumstances of the different classes. Cobb v. Bord, 40
Minn. 479, 42 N. W. 396; State ex rel. Oblinger v. Spaude, 37 Minn.
322, 34 N. W. 164; Sutherland, Stat. Constr. § 127; Cooley, Const.
Lim. 141; Vermont Loan & T. Co. v. Whithed, 2 N. D. 94, 49 N. W.
318; Edmonds v. Herbrandson, 2 N. D. 273, 14 L. R. A. 725, 50 N.
W. 970; State ex rel. Richards v. Hammer, 42 N. J. L. 439; Nichols
v. Walter, 37 Minn. 264, 33 N. W. 800; Plummer v. Borsheim, 8 N.
D. 565, 80 N. W. 690; State v. Cougal, 3 S. D. 55, 15 L.R.A. 477,
44 Am. St. Rep. 756, 51 N. W. 858.

If the statute is to be construed as forbidding the sale of lard in pails
of any other than the size stated, it is an unreasonable and unlawful
exercise of the police power, because it goes beyond the evil sought to
be cured. Chicago v. Schmidinger, 243 Ill. 168, 44 L.R.A.(N.S.)
632, 90 N. E. 369, 17 Ann. Cas. 614, 226 U. S. 578, 57 L. ed. 364, 33
Sup. Ct. Rep. 182.

It is not fair to rely upon the early cases as justify this character
of legislation. Guillotte v. New Orleans, 12 La. Ann. 432; Mobile
v. Yuille, 3 Ala. 137, 33 Am. Dec. 441; Paige v. Fazackerly, 36 Barb.
392; Buffalo v. Collins Baking Co. 39 App. Div. 432, 57 N. Y. Supp.

347; People v. Wagner, 86 Mich. 594, 13 L.R.A. 286, 24 Am. St. Rep. 141, 49 N. W. 609; Com. v. McArthur, 152 Mass. 522, 25 N. E. 836; Chicago v. Schmidinger, 243 Ill. 168, 44 L.R.A.(N.S.) 632, 90 N. E. 369, 17 Ann. Cas. 614; State v. McCool, 83 Kan. 428, 111 Pac. 477.

The exercise of the police power of the state is limited and prescribed. Rochester v. West, 29 App. Div. 125, 51 N. Y. Supp. 482; Dill. Mun. Corp. 3d ed. §§ 319, 320; Ford v. Standard Oil Co. 32 App. Div. 600, 53 N. Y. Supp. 48; People v. Gillson, 109 N. Y. 398, 4 Am. St. Rep. 465, 17 N. E. 343; Slaughter-house Cases, 16 Wall. 36, 106, 21 L. ed. 394, 418; People v. Marz, 99 N. Y. 377, 52 Am. Rep. 34, 2 N. E. 29; Buffalo v. Collins Baking Co. 24 Misc. 745, 53 N. Y. Supp. 968; Buffalo v. Hill, 79 App. Div. 408, 79 N. Y. Supp. 449; People ex rel. Appel v. Zimmerman, 102 App. Div. 105, 92 N. Y. Supp. 497; People ex rel. Lodes v. Health Dept. 117 App. Div. 864, 103 N. Y. Supp. 275; Ex parte Dietrich, 149 Cal. 104, 5 L.R.A.(N.S.) 873, 84 Pac. 770.

*Arthur W. Fowler,* State's Attorney, Cass County, *Andrew Miller,* Attorney General, *Alfred Zuger,* and *John Carmody,* for respondent, *Edward Engerud,* counsel for respondent.

The object of all net weight and measure laws is to circumvent the opportunity for practice of imposition upon buyers, which is always possible in sales of ready-made packages. Freund, Pol. Power, § 274; Tiedeman, Pol. Power, § 89; People v. Wagner, 86 Mich. 594, 13 L.R.A. 286, 24 Am. St. Rep. 141, 49 N. W. 609; McLean v. Arkansas, 211 U. S. 539, 53 L. ed. 315, 29 Sup. Ct. Rep. 206.

"It would be more honest to charge the customer more for the tea than to make him pay for the wrapper." Lane v. Rendall [1899] 2 Q. B. 673, 69 L. J. Q. B. N. S. 8, 63 J. P. 757, 48 Week. Rep. 153, 81 L. T. N. S. 445, 16 Times L. R. 4.

Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond rational doubt. One branch of the government cannot encroach on the domain of another, without danger. The safety of our institution depends in no small degree on a strict observance of this salutary rule. Chicago, B. & Q. R. Co. v. McGuire, 219 U. S. 549, 563, 55 L. ed. 328, 337, 31

Sup. Ct. Rep. 259; State v. Aslesen, 50 Minn. 5, 36 Am. St. Rep. 620, 52 N. W. 220; Turner v. Maryland, 107 U. S. 38, 27 L. ed. 370, 2 Sup. Ct. Rep. 44.

The appellant does not deny that it is a proper exercise of police power to require lard and similar commodities, when not sold in bulk, but sold in packages or by the pail, to be sold in packages of fixed sizes. Wheeler v. Russell, 17 Mass. 258; Eaton v. Kegan, 114 Mass. 433; State v. Pittsburg & C. Coal Co. 41 La. Ann. 465, 6 So. 220; Levy v. Gowdy, 2 Allen, 320; James v. Josselyn, 65 Me. 138; Richmond v. Foss, 77 Me. 590, 1 Atl. 830; McLean v. State, 81 Ark. 304, 126 Am. St. Rep. 1037, 98 S. W. 729, 11 Ann. Cas. 72, 211 U. S. 539, 53 L. ed. 315, 29 Sup. Ct. Rep. 206; Gibbons v. Ogden, 9 Wheat. 1, 6 L. ed. 23; Com. v. McArthur, 152 Mass. 522, 25 N. E. 836; Mobile v. Yuille, 3 Ala. 137, 33 Am. Dec. 441; People v. Wagner, 86 Mich. 594, 13 L.R.A. 286, 24 Am. St. Rep. 141, 49 N. W. 609; Chicago v. Schmidinger, 243 Ill. 168, 44 L.R.A.(N.S.) 632, 90 N. E. 369, 17 Ann. Cas. 614; State v. McCool, 83 Kan. 428, 111 Pac. 477.

Such laws are enacted for the prevention of fraud and deception in trade and commerce, and are within the police power of the state. People v. Girard, 145 N. Y. 105, 45 Am. St. Rep. 595, 39 N. E. 823; John P. Squire & Co. v. Tellier, 185 Mass. 18, 102 Am. St. Rep. 322, 69 N. E. 312; State v. Campbell, 64 N. H. 402, 10 Am. St. Rep. 419, 13 Atl. 585; Neas v. Borches, 109 Tenn. 398, 97 Am. St. Rep. 851, 71 S. W. 50; People v. Luhrs, 195 N. Y. 377, 25 L.R.A.(N.S.) 473, 89 N. E. 171; Lemieux v. Young, 211 U. S. 489, 53 L. ed. 295, 29 Sup. Ct. Rep. 174; State v. Fourcade, 45 La. Ann. 717, 40 Am. St. Rep. 249, 13 So. 187; Butler v. Chambers, 36 Minn. 69, 1 Am. St. Rep. 638, 30 N. W. 308; State, Waterbury, Prosecutor, v. Newton, 50 N. J. L. 534, 2 Inters. Com. Rep. 63, 14 Atl. 604; Freund, Pol. Power, 275.

The classification contained in § 2 of the law is reasonable, and cannot be said to be arbitrary in its application. Paige v. Fazackerly, 36 Barb. 392; Rochester v. West, 29 App. Div. 125, 51 N. Y. Supp. 482; Buffalo v. Hill, 79 App. Div. 402, 79 N. Y. Supp. 449; People ex rel. Lodes v. Health Dept. 117 App. Div. 856, 103 N. Y. Supp. 275; Bertholf v. O'Reilly, 74 N. Y. 509, 30 Am. Rep. 323.

BURKE, J.  As early as chapter 72, Session Laws of 1899, the legis-
lature of the state of North Dakota enacted laws relative to pure foods
and honest weights.  This legislation covers almost every article of
food,—beverages, Paris green, paints, formaldehyde, and other articles
too numerous to mention.  The weight of a bushel of every kind of
grain is specified, as well as the size of a gallon, quart, pint, etc., in
liquids.  The sheriffs of the various counties are given authority to
examine and test scales and measures, and confiscate those found to be
false.  Among other subjects regulated is lard.  In 1905 an act was
passed providing that all articles of food should be considered mis-
branded if the package, bottle, or container did not bear the true net
weight, name of the real manufacturer or jobber, and the true grade
or class of the product, the same to be expressed in clear and distinct
English words in black type on a white background.  In 1907 this act
was re-enacted with a few changes, to read as follows: "If every pack-
age, bottle, or container does not bear the true net weight, the name of
the real manufacturer or jobbers, and the true grade or class of the
product, the same to be expressed on the face of the principal label in
clear and distinct English words, in black type on a white background,
said type to be in size uniform with that used to name the brand or
producer" [chap. 195], the same is to be considered misbranded, etc.
This article applied to all food products as well as lard.

Chapter 236, Sess. Laws 1911, reads as follows:  [Section 1. Food
sold by weight, measure or count.]  "Every article of food or beverage
as defined in the statutes of this state shall be sold by weight, measure,
or numerical count, and as now generally recognized by trade custom,
and shall be labeled in accordance with the provisions of the food and
beverage laws of this state.  Only those products shall be sold by nu-
merical count which cannot well be sold by weight or measure.  All
weights shall be net, excluding the wrapper or container, and shall
be stated in terms of pounds, ounces and grains avoirdupois weight,
and all measures shall be in terms of gallons of two hundred and thirty
one (231) cubic inches or fractions thereof, as quarts, pints, and ounces.
Reasonable variations shall be permitted and tolerations therefore shall
be established and promulgated by the food commissioner.  Section 2,
weight of lard.  *Every lot of lard* or of lard compound or of lard sub-
stitute, unless sold in bulk, *shall be put up in pails or other containers*

*holding one (1), three (3), or five (5) pounds net weight, or some whole multiple of these numbers, and not any fractions thereof.* If the container be found deficient in weight additional lard, compound or substitute shall be furnished to the purchaser to make up the legal weight. The *face label* shall show the true name and grade of the product, *the true net weight* together with the true name and address of the producer or jobber. If other than leaf lard is used then the label shall show the kind as 'back lard' or 'intestinal lard.' Every lard substitute or lard compound shall also show, in a manner to be prescribed by the food commissioner, the ingredients of which it is composed, and each and every article shall be in conformity with, and further labeled in accordance with the requirements under the food laws of this state. [Section 3. Weight of Bread.] A loaf of bread for sale shall be two pounds in weight. Bread, unless composed in chief part of rye or maize, shall be sold only in whole, half, and quarter loaves and not otherwise. Bread, when sold, shall, upon the request of the buyer, be weighed in his presence and if found deficient in weight additional bread shall be delivered to make up the legal weight, except that this section shall not apply to rolls or to fancy bread weighing less than one quarter of a pound. Provided, every loaf, half loaf, quarter loaf or other loaf of bread which does not weigh the full legal weight required by this section when plainly labeled with the exact weight thereof, shall not be deemed in violation of the provisions of this act."

The defendant is a corporation, with packing houses in Chicago, Kansas City, Omaha, and other larger cities, doing a large business in the various lines incident to the packing trade. They maintain a branch establishment in the city of Fargo, in this state, in charge of a general manager. In October, 1911, Professor Ladd, state food commissioner, went to this establishment and asked to purchase 3 pounds of Armour's Shield Lard. He was sold a pail which is one of the exhibits in this case, and which admittedly contained 2 pounds, 6 ounces of lard. Upon complaint of the food commissioner, arrest was made under the provisions of the 1911 law. The purchase was made and the complaint filed with the direct object of testing the constitutionality of the law. The defendant admits the sale within the state of a single pail of lard, but urges that the law is unconstitutional and void in so far as it attempts to regulate the size of the pail, for six reasons given in the appellant's

brief in the following language: "Our contentions still are, and we urge them with all confidence: (1) That this law is arbitrary and unreasonable, and cannot be justified under the police power of the state. (2) That it interferes with the guaranties of the right of freedom of contract and of the equal protection of the law afforded by the Constitution. (3) That it constitutes the taking of property without due process of law. (4) That it is class legislation. (5) That it is in violation of the commerce clause of the Federal Constitution; and (6) that in no event under proper construction of the statute can a conviction be sustained." We will discuss these objections in the order named.

(1) The first contention is that the law is arbitrary, unreasonable, and not justified under the police power of the state. Thereunder appellant has advanced six arguments, and we will therefore subdivide this first subject, and discuss each of the reasons given under the designation of a letter of the alphabet. Before taking up those matters in detail a few general remarks may be useful. The lard sold in this instance was not adulterated, but misbranded under said statute, but the principles governing are identical. The questions of pure food and honest weights are inseparably allied, and any argument advanced upon one applies equally to the other. That the subject is well within the police power of the state is so well settled that it seems a waste of time to cite authorities at length, and we will therefore content ourselves with a few citations upon this general proposition. In the excellent work of Thornton on Pure Food & Drugs, § 3, we find: "At this day and age it seems scarcely necessary to state the ground upon which pure food legislation rests, nor to cite cases in support of it. The right . . . rests upon the police power of the state, which remains unimpaired by the Federal Constitution. . . . It has not only the right, but it is a duty and obligation which the sovereign power owes to the public, and as no one can foresee the emergency or necessity which may call for its exercise, it is not an easy matter to prescribe the precise limits within which it may be exercised." (§ 4) "For it is the settled doctrine of this court that as government is organized for the purpose, among others, of preserving the public health and the public morals, it cannot devest itself of the power to provide for those objects, and that the 14th Amendment was not designed to interfere with the exercise of that power by the states." The same author, speaking of the power

of the legislature and the courts at § 4, says: "It is not a part of their [the courts] function to conduct investigations of fact entering into questions of public policy merely, and to sustain or frustrate the legislative will, embodied in statutes, as they may happen to approve or disapprove the determination of such questions. The power which the legislature has to promote the general welfare is very great, and the discretion which that department of the government has, in the employment of means to that end, is very large. While both the power and its discretion must be so exercised as not to impair the fundamental rights of life, liberty, and property, . . . yet in many cases of mere administration the responsibility is purely political, no appeal lying except to the ultimate tribunal of the public judgment, exercised either in the pressure of public opinion or by means of the suffrage," quoting from Yick Wo v. Hopkins, 118 U. S. 370, 30 L. ed. 226, 6 Sup. Ct. Rep. 1064. In Powell v. Pennsylvania, 127 U. S. 678, 32 L. ed. 253, 8 Sup. Ct. Rep. 992, 1257 (affirming 114 Pa. 265, 60 Am. Rep. 350, 7 Atl. 913, 7 Am. Crim. Rep. 32), it is said: "If all that can be said of this legislation is that it is unwise or unnecessarily oppressive to those manufacturing . . . an article of food, their appeal must be to the legislature or to the ballot box, not to the judiciary. The latter cannot interfere without usurping powers committed to another department of government." See also: McCrary v. United States, 195 U. S. 27, 49 L. ed. 78, 24 Sup. Ct. Rep. 769, 1 Ann. Cas. 561; Walker v. Pennsylvania, 127 U. S. 699, 32 L. ed. 261, 8 Sup. Ct. Rep. 1204; State v. Schlenker, 112 Iowa, 645, 51 L.R.A. 347, 84 Am. St. Rep. 360, 84 N. W. 699; St. Louis v. Schuler, 190 Mo. 524, 1 L.R.A.(N.S.) 928, 89 S. W. 621; State v. Layton, 160 Mo. 474, 62 L.R.A. 163, 83 Am. St. Rep. 487, 61 S. W. 171; State v. Sherod, 80 Minn. 446, 50 L.R.A. 660, 81 Am. St. Rep. 268, 83 N. W. 417; Com. v. Evans, 132 Mass. 11; State v. Smith, 58 Minn. 35, 25 L.R.A. 759, 59 N. W. 545; Com. v. Waite, 11 Allen, 264, 87 Am. Dec. 711; Stolz v. Thompson, 44 Minn. 271, 46 N. W. 410. From State v. Smith, 58 Minn. 35, 25 L.R.A. 759, 59 N. W. 545, we quote: "When a subject is within that [the police] power, the extent to which it shall be exercised, and the regulations to effect the desired end, are generally wholly in the discretion of the legislature." State v. Mrozinski, 59 Minn. 465, 27 L.R.A. 76, 61 N. W. 560; Helena v. Dwyer, 64 Ark. 424, 39 L.R.A.

266, 62 Am. St. Rep. 206, 42 S. W. 1071; State, Borden's Condensed
Milk Co., Prosecutor, v. Board of Health, 81 N. J. L. 218, 80 Atl. 30;
Jacobson v. Massachusetts, 197 U. S. 11, 49 L. ed. 643, 25 Sup. Ct.
Rep. 358, 3 Ann. Cas. 765; Valentine v. Englewood, 76 N. J. L. 509,
19 L.R.A.(N.S.) 262, 71 Atl. 344, 16 Ann. Cas. 731; California Re-
duction Co. v. Sanitary Reduction Works, 199 U. S. 306, 50 L. ed. 204,
26 Sup. Ct. Rep. 100; Gardner v. Michigan, 199 U. S. 325, 50 L. ed.
212, 26 Sup. Ct. Rep. 106; Laurel Hill Cemetery v. San Francisco,
216 U. S. 358, 59 L. ed. 515, 30 Sup. Ct. Rep. 301; Atlantic City v.
Abbott, 73 N. J. L. 281, 62 Atl. 999. The rights of the courts are thus
set forth by the supreme court of Missouri, in St. Louis v. Liessing, 190
Mo. 464, 1 L.R.A.(N.S.) 918, 109 Am. St. Rep. 774, 89 S. W. 611,
4 Ann. Cas. 112. "If the article is universally conceded to be so whole-
some and innocuous that the court may take judicial notice of it, the
legislature under the Constitution has no right to absolutely prohibit
it; but if there is a dispute as to the fact of its unwholesomeness for
food or drink, then the legislature can either regulate or prohibit it.
The constitutionality of the law is not to be determined upon a question
of fact in each case, but the courts determine for themselves upon the
fundamental principles of our Constitution that the act of the legis-
lature or municipal assembly is not to be declared void unless the viola-
tion of the Constitution is so manifest as to leave no room for reasonable
doubt." See also State v. Layton, 160 Mo. 478, 62 L.R.A. 163, 83 Am.
St. Rep. 487, 61 S. W. 171; also Adams v. Milwaukee, 144 Wis. 371,
43 L.R.A.(N.S.) 1066, 129 N. W. 518. Thornton on Pure Food &
Drugs, p. 18: "If there be a doubt upon the question, then the court
cannot substitute its opinion for that of the legislature. In such an
instance the opinion of the legislature must be considered as right and
binding." See also Rigbers v. Atlanta, 7 Ga. App. 411, 66 S. E. 991; ·
State, Borden's Condensed Milk Co., Prosecutor, v. Board of Health, 81
N. J. L. 218, 80 Atl. 30.

Keeping in mind, then, the extraordinary burdens of proof placed
upon the defendant in this case in its attack upon this statute, we ap-
proach the facts in this case. As early as 1899 the legislature of this
state provided for a food commissioner, and enacted pure food laws.
Every session of the legislature since that time has contributed further
legislation upon the subject. For nearly fifteen years complaining

witness Ladd has been such pure food commissioner, and the Agricultural College of this state has maintained a department for the testing of foods and weights, and often has had men traveling over the state, making purchases, and studying the subject of pure foods and honest weights and measures in a scientific and painstaking manner. It is not unreasonable to assume that the 1911 law was drafted by such department, after twelve years of observation and study. The expert who drafted the law, the legislature who passed it, and the governor who approved it, all thought necessity existed for such a measure. If we did not agree with all of those, we might well hesitate to say that there was absolutely no doubt upon the question, but in fact a majority of this court believes the law reasonable, and this belief is founded upon the evidence in this case. We will now discuss in order the subdivisions of appellant's first objection to the law.

(a) Appellant contends that chapter 195, Sess. Laws 1907, was amply sufficient to protect the commerce of the state against fraud, and that there was no necessity for the 1911 legislation, and the same is therefore void. We cannot agree with this proposition. The 1907 law was a re-enactment of the 1905 law, with a few amendments, and its text will be found earlier in this opinion. It provided that the net weight should be placed upon each package of food. The legislature was not confined to this remedy. They might repeal it and provide further regulations if they so chose. They had as much right under the police power to require even weights as they had to require the net weight to be printed upon the outside of the pail. This court has no right to interfere with legislation and say that one measure is superior to the other. During the last dozen years there has been a decided tendency of manufacturers to pack foods in cans and packages. Improved machinery and improved sanitary conditions have enabled foods to be packed cheaply and safely, therefore conditions have been changing year by year and legislation necessarily must change to meet them. The object of all net weight and measure laws is to prevent the *opportunity for fraud*. See Freund, Pol. Powers, § 274; Tiedeman, Pol. Power, § 89; People v. Wagner, 86 Mich. 594, 13 L.R.A. 286, 24 Am. St. Rep. 141, 49 N. W. 609; McLean v. Arkansas, 211 U. S. 539, 53 L. ed. 315, 29 Sup. Ct. Rep. 206. It is not material whether the defendant in this case was guilty of fraud in the sale of this particular

pail of lard, but was the manner of the preparation of the pail such that the people generally might be defrauded? The consumers do not have to depend upon the honesty of the manufacturer in every case. They are entitled to laws allowing them to ascertain the facts themselves. The honest manufacturers, as well as the consumers, are entitled to protection from competition with dishonest weights. There was therefore a necessity for some sort of legislation upon this subject in this state. Taking up in particular the lard industry, we find from the evidence in this case that the packers as a whole supply but 40 per cent of the lard used in this state, while 60 per cent is supplied by local butchers and the consumers themselves. Defendant has one of the largest of the packing houses, but does not of course supply more than its fair share of the trade, dividing with such houses as Swift & Company, Cudahy & Company, and Morris & Company, at least. It is apparent, therefore, that they represent something less than 10 per cent of the lard industry, and if they have obeyed the law of 1907 (which we do not concede) it would not be proof that the other 90 per cent of the industry had likewise obeyed the law. Besides, the defendant sells only to the middlemen, and there is no proof that the middlemen who purchased from defendant were obeying the 1907 law. It is thus apparent that the behavior of the defendant has but a remote bearing upon the necessity for the 1911 regulation. Nor would the fact that the defendant was obeying the 1907 law at the time of the arrest be any proof that it was obeying it at the time of the passage of the 1911 law. In other words, the law was enacted for the protection of the consumer, and the conduct of defendant in one sale is only slightly material on the general condition. Approaching still closer to the case in hand, we inquire whether or not the defendant was obeying the 1907 law. We discuss this with reluctance, because the defendant is undoubtedly following the trend of the trade of the general packers, and it is not in justice to be singled out from the others. Unquestionably, defendant makes a fine grade of lard, and much may be said in its favor from a trade standpoint. However, it has forced this argument upon us and we would be remiss in our duty did we not answer it with candor. When Professor Ladd purchased the pail of lard in evidence; it bore upon its side a lithographed label in five colors, bearing the advertisement of the lard. The words "Armour's Pure Lard" are

printed upon this label in letters over a quarter of an inch in height and covering six and three quarters of an inch in length, while the name "Shield" covers four running inches, and the small letters stand three eighths of an inch in height and the capitals larger, but upon this label there is no net weight, as required by the 1907 law (which see), but upon the left and rear of the pail completely out of sight as it would stand upon a shelf, we find a paper tag about the size of a silver half dollar, and placed thereon in aniline ink, evidently with a rubber stamp, the words, "net weight 2 lbs., 6 oz.," in letters about one eighth of an inch in height and covering three quarters of an inch in length. The wording upon the paper label is scarcely 10 per cent in size of that used in giving the name of the kind of lard. It is hard to avoid the conclusion that the defendant company prepared those tags to give the least notice possible to the consumer and yet make a showing of complying with the 1907 law. In the face of this showing alone, the legislature was amply justified in passing the 1911 act. If it be claimed that this paper tag was a temporary affair to be used until pails could be manufactured showing the net weight upon the principal label in a permanent form, we have merely to turn to the evidence of Mr. Howe, general manager of the Chicago House, where he testifies that those tags had been in use for about six years at the time of the trial, and that they were in use ever since the first pure food laws were enacted. It evidently was not the intention of this defendant to use any other designation upon their pails, or they would have done so, as they were making thousands of pails every day.

With this conduct of the packers well known to the food commissioner and legislature of this state, it was only natural that an effort be made to secure better laws upon the subject. People had been educated to call those 1, 3, 5, and 10 pound pails, as appears from the testimony of the defendant. Indeed, exhibit B in this case is a bill from Armour & Company to the Aneta Mercantile Company of Aneta, North Dakota, in which those pails were so designated by the defendant company itself. The purchaser was not able readily to extract the lard from the pail and weigh it. The lard was used from the pail itself in small portions, and the fact that the pail was included in the gross weight might not ordinarily occur to the housewife. The contention of the

defendant that it had complied with the 1907 law, and that said law was sufficient to protect the consumers, is unsupported by the evidence.

(b) Defendant further claims the law to be unreasonable, because it had been its custom and the custom of the other packers for over twenty years to use gross-weight pails, and that it had therefore become a settled right of the trade. We do not believe this argument sound. The pails have been in use less than thirty years, while the lard industry has existed for many hundreds of years. Questions like this are not settled in a day, nor in thirty years. No reason is given why gross-weight pails were used in the beginning. Gross weight is unfair, always has been unfair, and always will be unfair. Net weight is fair and just, and should eventually predominate. It is hard to believe that the selection of gross-weight pails thirty years ago was not an attempt to deceive somebody. Can it be possible that a thirty years' tolerance of an evil forever thereafter forecloses mankind from seeking a remedy? It may be that North Dakota now stands alone in this particular law; twelve years ago it stood alone, or almost alone, upon the entire subject of pure-food regulations. To-day there is scarcely a state in the Union that has not such legislation. Public opinion has forced this legislation, and it will force the net-weight legislation. Net-weight pails may be the rule, and not the exception in a very few years. While it is just that the consumer pay for the container, it is equally just that he should know how much container he was purchasing and how much lard.

(c) Defendant next contends that the law is unreasonable because it imposes an additional expense upon the packers in that they must furnish a different sized paid for North Dakota than is supplied to the rest of the states. Much evidence was introduced upon this point, but it does not appeal to us for two reasons: (1) There is no reason for furnishing other states with gross-weight pails, and (2) the evidence in this case shows that the defendant could comply with the North Dakota law with little extra expense. Mr. Nichols, superintendent of the defendant's tin shops, was one of the witnesses, and upon cross-examination admitted that the firm of Park & Tilford, of New York city, had insisted upon receiving net-weight pails, and was being supplied with the same by Armour & Company during all the time of this litigation. He says: "Q. And you make net-weight pails for them now? A. Yes, sir. We make and fill them. . . . Q. For how long?

A. I don't know, I am sure. A few years." It further appears that those pails were made in the shops of the defendant, and that they had full machinery for making the net-weight pails and could have made a few more for the North Dakota trade. To be true, the pails made for Park & Tilford are of a slightly different shape than those used under the Armour name, and contain Park & Tilford's name upon the label. But we see no reason why the Armour label could not have been placed upon some of those pails for use in North Dakota. A supply of empty pails could be kept at each packing establishment and filled for the North Dakota trade as the orders were received. At any event it would be no more expensive to furnish the sovereign state of North Dakota with those pails than it was to supply a private firm. There is no argument advanced showing extra expense in one case that would not occur in the other. That mail-order houses may supply North Dakota patrons with gross-weight pails is immaterial. The mail-order houses are protected under the provisions of the interstate commerce clause. Our law only applies to sales made within the state of North Dakota.

(d) It is next urged that the law is unreasonable because in any event the consumers are not prejudiced. That they are paying merely the price of tierce lard plus the extra expense of the tin pails, the handling of the lard in such small quantities, and packing the same. We think this argument fails, and again for two reasons. (1) The defendant does not sell to the consumer, but to middlemen. Conceding that defendant charges the middlemen merely for the actual cost of pails, we know that the middlemen would expect to profit upon his entire investment, and therefore the consumer would have to pay not the net cost of the container, but the middlemen's profit thereon as well. In exhibit B defendant sold to the Aneta Mercantile Company 1 case of 3-pound pails. The case contained 20 pails, and the Mercantile Company was charged for 60 pounds of lard at 16⅞ cents a pound, or $10.13. When the Mercantile Company placed these pails upon the counter for sale they naturally added a profit upon the whole amount invested. They had purchased 47½ pounds of lard and 12½ pounds of tin and had paid 16⅞ cents a pound for the whole. When they sold the same the purchaser would be obliged to pay for the lard, with the profit thereon, to the Mercantile Company, and for the pail with the same profit to the Mercantile Company; and, while Armour

27 N. D.—13.

& Company might have made nothing upon the pail, yet the customer paid a profit. (2) An analysis of the evidence shows that the defendant company gets something besides the net cost of his pail. The plain pail costs little, but the defendant, seeing an opportunity of a lasting advertisement, has taken advantage of the consumer to advertise his goods at the housewife's expense. Mr. Nichols, explaining the manner of the preparation of the pails, says: "They are electro-type plates made of compound, compound filled with electrotype material. . . . There are four operations before it is discharged from the machine. First, the machine changes the tin, puts on one color; revolves, puts on another color, and so on till it gets five colors on, then it discharges it. . . . We have a lithographing press to do the lithographing and lacquering of the bodies, and we have a coating machine. Now, each of those machines has an oven. After it is lithographed and the lacquer, that is, the front of the lard can, there—the label is put on and lacquer around the label, it has to go into an oven with 318 degrees to 330 degrees heat, stay in four or five hours according to the atmosphere, sometimes six." The manager of the company testifies that the company gets the benefit of the lasting advertisement free. Analysis of the testimony therefore shows that Armour & Company is charging an expense of the advertising of their general business up to the lard industry. When a 20-pound pail of lard is sold it contains 18 pounds of lard and 2 pounds of pail. If the consumer pays 25 cents a pound he has paid 50 cents for the pail and $4.50 for the lard. This pail has cost the defendant around 4 cents for tin and a few cents for the making of the pail, which is done by machinery and very cheaply, and the rest of the charge must be for incidental expenses, including the lithographing, and nobody knows the items thereof. The consumer is entitled to this information, and the 1911 law helps to supply it. The policy of all such laws is to make it easy for the purchaser to calculate the price that he is paying for the lard, and to detect fraud. As we have said before, it is not a question so much of the intention of one particular packer, but a question of opportunity for fraud. It is hard to conceive of any system offering more opportunities for fraud than the gross-weight system. If some dishonest packer should decide that the present pail was too light to stand the strain of commerce, and should double the weight of his pail, the housewife would pay lard prices for tin,

and honest packers would find themselves competing with the rascal who was making a 25 per cent profit to which he was not entitled.

(e) It is next urged that the law is unreasonable in that other traders have been using gross-weight methods also. For instance, they claim that butchers weigh the paper along with the meat, and charge meat prices for the paper. To this we have only to say that if the statement is true, the butcher is dishonest in charging 25 cents a pound for paper that cost him less than a cent a pound. However, this would not help the defendant. The fact that the butcher may be dishonest in his business does not excuse dishonest methods in other lines, nor render unreasonable laws to regulate them.

(f) The defendant urges that the enforcement of this law will drive the packers to use bulk lard only, and that this is unsanitary. This is not in point. The packers have never supplied more than 40 per cent of the trade of this state. During the past two years the packers have withdrawn from this state with their pails, and there is no sign of any great damage to the state. We do not believe the packers will abandon North Dakota nor that it would ruin the state if they did.

Thus, upon complete analysis we find that the 1911 law is not unreasonable, arbitrary, or capricious: that it has supplied a necessary piece of legislation and that it has worked no hardship upon the defendant in this case.

We think that we have given reasons enough to sustain our position without reference to the decisions of other states, but upon an examination of all the authorities upon statutes in any way similar we find our position sustained by a large majority of the decisions. True, no state has a law *exactly like* our net-weight lard law, but other states have regulated similar articles, bread, corn meal, tobacco, molasses, etc., generally. We review a few of those cases. The state of Tennessee enacted a law requiring corn meal to be put up in sacks containing 2 bushels, 1 bushel, $\frac{1}{2}$ bushel, $\frac{1}{4}$ bushel, or $\frac{1}{8}$ bushel respectively, and made it unlawful to pack for sale, or sell, or offer for sale any corn meal in bags of other weights. This is almost identical in principle with the case at bar. This is a well-considered case collecting almost all of the authorities. Therefrom we quote: "Legislation for the prevention of fraud in weights and measures, especially in the sale of food and other essentials of life, was early enacted in England and is common in all the state.

. . . It simply provides that when a certain staple article of food, of universal consumption in this country, is sold in packages, the packages shall contain certain quantities of the article, and that the quality and quantity . . . . shall be printed and marked thereon. It is well known that corn meal is generally sold by the bushel, or the fraction of a bushel, and is put in packages purporting to contain such quantities, and the object of the statute is to prevent the giving of short weights in these packages, and the consumers from thus being deceived and defrauded, it is true of small sums, but which on account of the numerous sales, in the opinion of the legislative department, is a public evil which should be suppressed. It in no sense deprives the owner of his property, or the power to sell and dispose of it in a fair and honest manner. Nor is the act when properly construed discriminatory. It does not prohibit the manufacturer, the wholesaler, or any person from selling meal in any bag or other receptacle, or quantity, desired by the seller or consumer when priced and delivered by actual weight or measure. All persons, whether retailers or not, may sell it in that way. The statute only applied where it is put in bags or packages for sale, and sold or offered for sale without being weighed or measured." For the benefit of persons who have not access to this (Tennessee) case we repeat the authority. State v. Co-operative Store Co. 123 Tenn. 399, 131 S. W. 867, Ann. Cas. 1912C, 248; People v. Luhrs, 195 N. Y. 377, 25 L.R.A. (N.S.) 473, 89 N. E. 171; People v. Girard, 145 N. Y. 105, 45 Am. St. Rep. 595, 39 N. E. 823; People v. Wagner, 86 Mich. 594, 13 L.R.A. 286, 24 Am. St. Rep. 141, 49 N. W. 609; John P. Squire & Co v. Tellier, 185 Mass. 18, 102 Am. St. Rep. 323, 69 N. E. 312; State v. Campbell, 64 N. H. 402, 10 Am. St. Rep. 419, 13 Atl. 585; Neas v. Borches, 109 Tenn. 398, 97 Am. St. Rep. 851, 71 S. W. 50; Lemieux v. Young, 211 U. S. 489, 53 L. ed. 295, 29 Sup. Ct. Rep. 174; State v. Fourcade, 45 La. Ann. 717, 40 Am. St. Rep. 249, 13 So. 187; Butler v. Chambers, 36 Minn. 69, 1 Am. St. Rep. 638, 30 N. W. 308; State, Waterbury, Prosecutor, v. Newton, 50 N. J. L. 534, 2 Inters. Com. Rep. 63, 14 Atl. 604; Freund, Pol. Power, § 275. We also believe the bread cases, as they are called, are an authority upon this proposition. We will not lengthen this opinion by extracts from those cases, but it is sufficient to say that there is not much difference in principle between regulating the weight of a loaf of bread and the con-

tents of a pail of lard. Below is a list of those cases: Com. v. McArthur, 152 Mass. 522, 25 N. E. 836; Mobile v. Yuille, 3 Ala. 137, 36 Am. Dec. 441; People v. Wagner, 86 Mich. 594, 13 L.R.A. 286, 24 Am. St. Rep. 141, 49 N. W. 609; Chicago v. Schmidinger, 243 Ill. 468, 44 L.R.A.(N.S.) 632, 90 N. E. 369, 17 Ann. Cas. 614, 226 U. S. 578, 57 L. ed. 364, 33 Sup. Ct. Rep. 182; State v. McCool, 83 Kan. 428, 111 Pac. 477; State v. Belle Springs Creamery Co. 83 Kan. 389, — L.R.A.(N.S.) —, 111 Pac. 474. Also in point, as we think, are the coal cases and particularly McLean v. State, 81 Ark. 304, 126 Am. St. Rep. 1037, 98 S. W. 729, 11 Ann. Cas. 72, in which the supreme court of Arkansas sustained a law having many features similar to our statute. Upon appeal to the Supreme Court of the United States this case was in all things affirmed. See 211 U. S. 539, 53 L. ed. 315, 29 Sup. Ct. Rep. 206. We find an excellent discourse upon this subject by the highest court of this land, from which we give a short quotation, as it is a very recent case and practically overrules Millett v. People, 117 Ill. 294, 57 Am. Rep. 869, 7 N. E. 631, which is practically the only case relied upon by the appellants: "Liberty of contract which is protected against hostile state legislation is not universal, but is subject to legislative restrictions in the exercise of the police power of the state. . . . The legislature of the state is primarily the judge of the necessity of exercising the police power, and courts will only interfere in case the act exceeds legislative authority; the fact that the court doubts its wisdom or propriety affords no ground for declaring a state law unconstitutional or invalid." Also more or less in point, we think, are the shingle cases, oleomargarine cases, tobacco cases, and others too numerous to mention, but which may be found in a note to the Tennessee cases, where the same is reported in Ann. Cas. 1912C, at page 251, and running to page 259. The text writer gives a list of the statutes which, as he said, "intended to prevent fraud by prohibiting arbitrary deductions by buyers from the gross weight of particular commodities, has been held to be within the police power of the state, and not to interfere unlawfully with the freedom of contract." Further authorities might be given, but space forbids.

(2) Taking up the second objection, the defendant claims the law unconstitutional because it interferes with the guaranties of the right of freedom of contract and of the equal protection of the law afforded

by the Constitution. This contention has been made so often and been so often overruled, that we will give it but the merest mention. We quote from Deems v. Baltimore, 80 Md. 164, 26 L.R.A. 541, 45 Am. St. Rep. 339, 30 Atl. 648, as follows: "To justify such interference with private rights, its exercise must have for its immediate object the promotion of the public good, and so far as may be practicable, every effort should be made to adjust the conflicting rights of the public and the private rights of individuals, at the same time the emergency may be so great and the danger to be averted so eminent, that private rights must yield to the paramount safety of the public. And to await in such cases the delay necessarily incident to ordinary judicial inquiry in the determination of private rights would defeat altogether the object and purposes for which the exercise of this salutary power was invoked. Whatever injury or inconvenience one may suffer in such cases, he is, in the eye of the law, compensated by sharing the common benefit resulting from the summary exercise of this power, and which, under the circumstances, was absolutely necessary for the protection of the public." See also Powell v. Com. 114 Pa. 265, 60 Am. Rep. 350, 7 Atl. 913, 7 Am. Crim. Rep. 32, supra. It thus follows that where the law is a reasonable exercise of the police power, that it does not interfere with the guaranties of the right of freedom of contract.

(3) The third contention of the appellant is that the statute constitutes the taking of property without due process of law. Much the same answer can be made to this that has been made in article 2. In the case at bar no property has been taken without due process of law.

(4) The fourth claim of appellant is that the 1911 statute is void as class legislation; that lard is singled out from all the articles of food and subjected to restrictions while being prepared for market. To this it need only be said that the law of 1911 as well as many preceding laws regulated the manner of selling *every article of food* and beverage. Lard, lard compounds, and lard substitutes being sold largely in pails, required a particular regulation not necessary for the regulation of such articles as butter, eggs, milk, and cream. The regulation of the size of the pail is but an incident of the law. The fact that all foods are subject to regulation to prevent the opportunity for deceit is the main idea of the law. In appellant's brief the argument is made that the 1911 law is discriminatory in that it prescribes no regulations for such

articles as crisco, cottolene, vegetole, it being the contention of defendant that those articles which contain no animal fat are not "substitutes of lard." The witness Fox was placed upon the stand evidently to testify as an expert to this effect, but upon cross-examination he admitted that those vegetable compounds are intended to and do take the place of lard and serve as a substitute for lard. The statute in express terms covers lard, lard compounds, and lard substitutes, and in our opinion applies as well to crisco and the other vegetable compounds as to lard itself, as those articles are used instead of and as a substitute for lard. There is therefore no discrimination against the lard industry. To the effect that those compounds are lard substitutes, see: State v. Hanson, 84 Minn. 42, 54 L.R.A. 468, 86 N. W. 768; State v. Aslesen, 50 Minn. 5, 36 Am. St. Rep. 620, 52 N. W. 220; State v. Snow, 81 Iowa, 642, 11 L.R.A. 355, 47 N. W. 777. Upon the question of class legislation, also see Powell v. Pennsylvania, 127 U. S. 678, 32 L. ed. 253, 8 Sup. Ct. Rep. 992, supra, from which we quote: "The statute places under the same restrictions and subjects to like penalties and burdens, all who manufacture, or sell, or offer for sale, or keep in possession to sell, the articles embraced by its prohibition; thus recognizing and preserving the principle of equality among those engaged in the same business."

(5) The fifth claim of the defendant is that the law is in violation of the commerce clause of the Federal Constitution. In this we believe that appellant is again mistaken. The power of Congress and the power of the state are two distinct and separate things. Thornton, in his excellent word on Pure Food and Drugs, says in his preface: "In the last few years great interest has been taken in the subject of pure food. .. . The Federal pure food and drugs act of June 30, 1906, has acted as an incentive for state legislation on the subject of foods and drugs. . . . Owing to the complex systems of government under which we live, the states were not able to protect their inhabitants as effectually as was necessary or desirable. They had no power over food that entered into interstate commerce, until it was too late adequately to protect the consumer. The Federal pure food and drug act of June 30, 1906, is intended to cover the point which the states were not able to reach, and it has been far more efficacious in its provisions than perhaps the law of any state has been for its own citizens. But the Federal statute does not by any means reach all instances of adulterated foods

and drugs. By far the greatest quantity of food never passes beyond, and it is never intended that it shall pass beyond, the boundaries of the state. *Congress cannot regulate the sale of this food. It remains for the state to do so.* There have been many statutes enacted by the states to cover this subject, especially since the adoption of the Federal statute of 1906. There is no state in the Union but what has enacted statutes on the subject of pure food and drugs, and quite a number of them are modeled—at least in part—after this one of 1906."

Whether or not the sale in this instance was an interstate or an intrastate sale becomes important in determinng whether the prosecution should be under the Federal or the state laws, and for this purpose we refer to the testimony in this case. Mr. Howe, general manager of the Omaha plant, testified that they had a branch office in Fargo, North Dakota, to which point carload lots were shipped, to be later broken up and distributed to the smaller towns of the state. Sales were not made to their customers in carload lots, owing to the small size of the local sales. Some of the state of North Dakota was covered from Aberdeen, South Dakota, in a like manner. Professor Ladd testifies that on the 8th day of September, 1911, in the city of Fargo, North Dakota, he went to the person in charge of the Armour & Company establishment at Fargo, and called for 3 pounds of Armour's Shield Lard. This was given to him, and he paid therefor, and took the same away. At that time the pail was one of a crate of 20 pails which had been crated for convenience in shipping. The manager of the defendant company broke open this crate, and took therefrom the single 3-pound pail of lard, and then and there sold it to Professor Ladd. Under these undisputed facts we are asked to say that the single pail of lard was an interstate shipment, and as such coming under the inhibitions of the Federal pure food law of 1906, and thereby not a violation of the state law. We find the law upon this point pretty well settled in the courts of the various states and of the United States under the heading of original packages. The cases under this subject are collected in Thornton on Pure Food & Drugs, § 88, and we will but briefly refer to some of the leading cases mentioned by him. Thus, in Austin v. Tennessee, 179 U. S. 343, 45 L. ed. 244, 21 Sup. Ct. Rep. 132, affirming 101 Tenn. 563, 50 L.R.A. 478, 70 Am. St. Rep. 703, 48 S. W. 305, it is said: "Original packages are such as are used in bona fide transactions carried on between

the manufacturer and wholesale dealers residing in different states," and in Guckenheimer v. Sellers, 81 Fed. 997, it is stated: "An original package within the meaning of the law of interstate commerce is a package delivered by the importer to the carrier at the initial point of shipment, in the exact condition in which it was shipped." In Re Harmon, 43 Fed. 372, it was held that where several bottles of whisky were wrapped in paper, and sealed and packed in an uncovered wooden box, and shipped from one state to another, that the wooden box was the original package and that the bottles were not. In one instance a merchant from Tennessee purchased from a factory in North Carolina a number of cigarettes in boxes, which were shipped to him in small packages containing ten cigarettes each. Those packages were piled together upon the floor of the factory in North Carolina, and the express company notified to come for them. An employee of the company took a large basket belonging to the company, and gathered therein the small individual boxes, put them upon the train, and shipped them into Tennessee. In the latter state there was a law prohibiting the sale of cigarettes. When the packages reached Tennessee, the agent of the express company took the basket to the store of the defendant, emptied the packages upon the counter, and took away with him the basket. The store keeper sold some of the cigarettes, and was arrested and convicted; he appealed to the supreme court of that state, claiming that each small package of cigarettes was an original package and an interstate transaction, making practically the same claim that is made in the case at bar. His conviction being affirmed in the Tennessee court, he then sued out a writ of error to the Supreme Court of the United States, where the conviction was again affirmed, and the Supreme Court of the United States said: "Original packages are such as are used in bona fide transactions carried on between the manufacturer and wholesale dealers residing in different states. Where the size of the package is such as to indicate that it was prepared for the purpose of evading the law of the state to which it is sent, it will not be protected as an original package against the police laws of that state." Austin v. Tennessee, supra, also Cook v. Marshall County, 196 U. S. 261, 49 L. ed. 471, 25 Sup. Ct. Rep. 233, 119 Iowa, 384, 104 Am. St. Rep. 283, 93 N. W. 372, where some boxes of cigarettes were shoveled into a car in Missouri and delivered in Iowa in that condition, and where a conviction was sustained

not only in the state courts, but upon appeal to the United States Court. See also Plumley v. Massachusetts, 155 U. S. 461, 39 L. ed. 223, 5 Inters. Com. Rep. 590, 15 Sup. Ct. Rep. 154, affirming 156 Mass. 236, 15 L.R.A. 839, 30 N. E. 1127; and Crossman v. Lurman, 192 U. S. 189, 48 L. ed. 401, 24 Sup. Ct. Rep. 234, affirming 171 N. Y. 329, 98 Am. St. Rep. 599, 63 N. E. 1097, which latter cases were decisions upon the law as it existed prior to the enactment of the 1906 United States Law. Thornton says: "From a consideration of all the decisions and upon the basis of common understanding of the words, it seems that an original package within the meaning of the food and drugs act is a unit complete in itself delivered by the shipper to the carrier, addressed to the consignee, and received by him in the identical condition in which it was sent, without separation of the contents in any manner. This unit may be hogshead containing 500 bottles of wine, or a single can of tomatoes, or it is a small ounce phial of some drug if shipped to the consignee in that form; and if the consignee sells or gives away any one of the three in the unaltered condition in which he received it, if the contents be adulterated or misbranded, he has violated the act." [§88] Thornton referring, of course, to the United States act. It follows as a natural conclusion that if he broke the packages and sold one of them, and it was misbranded, it would be a violation of the state act.

The breaking of the original package once, if not twice (car and case), before the sale was made, added the goods to the general property of the state of North Dakota, and the subsequent sale was an intrastate transaction and subject alone to the laws of the state of North Dakota. It naturally follows that the defendant is not protected under the commerce clause of the United States Constitution.

(6) We reach now the sixth heading, that in no event under a proper construction of the statute can a conviction be sustained. At the oral argument of this case counsel stated that they had no intention of raising any minor objection to the information, nor did they desire a decision which would evade the question of the constitutionality of the law in question, and that under this objection they meant to be considered the following proposition: that the courts should give a reasonable construction to the law, and in this instance hold that, notwithstanding the wording of the law, that it should be so construed as to permit the

sale of any sized pail providing that the net weight were stated thereon. In answer to this we have to say that the wording of the statute is too plain to admit of any such construction. The object of the law was to prevent the opportunity for fraud presented when the pail did not contain an even number of pounds, net weight. Any other construction would effectually wipe out the statute itself. This construction cannot be supported by reason or authority, and it will not be adopted by this court.

(7) At the time of the oral argument the objection was made to the statute that the pure food and drug act of June 30, 1906, was an assumption of the entire field by Congress, and that therefore the laws of North Dakota upon that subject were in effect repealed or rendered inoperative. Under § 5 we have outlined fully the field of congressional control and the field of state control. Congress can only regulate interstate commerce. The states have exclusive control of intrastate commerce, and, in the absence of legislation of Congress, have certain rights of control over interstate commerce within the boundaries of the state, while Congress is limited to control of "commerce with foreign nations, among the several state, and with the Indian tribes." The assumption by Congress of its authority to regulate the interstate commerce effects nothing excepting the right of the state to control interstate commerce within its borders, and does not in any manner curtail the right of the state to control its own commerce, provided such state control does not incidentally interfere with interstate commerce. It is thus seen that none of the objections raised by the defendant to the validity of chapter 236, S. L. 1911, has any merit, and as no other points have been presented to us, we must hold that the law is constitutional, and the conviction thereunder is accordingly affirmed.

BRUCE, J. (specially concurring.) I concur in the opinion of Mr. Justice Burke. The relative spheres of the courts and of the legislatures in the matter of the so called police power control seem now to have been well defined by the courts of the county, and especially by the Supreme Court of the United States. In Planters' Bank v. Sharp (1848) 6 How. 301, 319, 12 L. ed. 447, 455, we find the following: "It is to be recollected that our legislatures stand in a position demanding often the most favorable construction for their motives in

passing laws, and they require a fair rather than hypercritical view of well-intended provisions in them. Those public bodies must be presumed to act from public considerations, being in a high public trust; and when their measures relate to matters of general interest, and can be vindicated under express or justly implied powers, and more especially when they appear intended for improvements, made in the true spirit of the age, or for salutary reforms in abuses, the disposition in the judiciary should be strong to uphold them."

In the Sinking Fund Cases, 99 U. S. 718, 25 L. ed. 501, Mr. Justice Waite, in speaking for the court, said: "Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt. One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule." In the case of Chicago, B. & Q. R. Co. v. Mc Guire, 219 U. S. 563, 55 L. ed. 337, 31 Sup. Ct. Rep. 259, the court, among other things, said: "There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community. . . . Where the legislative action is arbitrary and has no reasonable relation to a purpose which it is competent for government to effect, the legislature transcends the limits of its power in interfering with liberty of contract; but where there is reasonable relation to an object within the governmental authority, the exercise of the legislative discretion is not subject to judicial review. The scope of judicial inquiry in deciding the question of *power* is not to be confused with the scope of legislative considerations in dealing with the matter of *policy*. Whether the enactment is wise or unwise, whether it is based on sound economic theory, whether *it is the best means to achieve the desired result*, whether, in short, the legislative discretion within its prescribed limits should be exercised *in a particular manner,* are matters for the judgment of the legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance. . . . 'The

legislature, being familiar with local conditions, is, primarily, the judge of the necessity of such enactments.  The mere fact that a court may differ with the legislature in its views of public policy, or that *judges may hold views inconsistent with the propriety of the legislation in question, affords no ground for judicial interference,* unless the act in question is unmistakably and palpably in excess of legislative power. . . .  If there existed a condition of affairs concerning which the legislature of the state, exercising its conceded right to enact laws for the protection of the health, safety, or welfare of the people, might pass the law, it must be sustained; if such action was arbitrary interference with the right to contract or carry on business, and having no just relation to the protection of the public within the scope of legislative power, the act must fail.' "  See also People v. Smith, 108 Mich. 527, 32 L.R.A. 853, 62 Am. St. Rep. 715, 66 N. W. 382; Wenham v. State, 65 Neb. 394, 58 L.R.A. 825, 91 N. W. 421; Powell v. Pennsylvania, 127 U. S. 678, 32 L. ed. 253, 8 Sup. Ct. Rep. 992, 1257; Holden v. Hardy, 169 U. S. 366, 42 L. ed. 780, 18 Sup. Ct. Rep. 383; People v. Bellet, 99 Mich. 151, 22 L.R.A. 696, 41 Am. St. Rep. 589, 57 N. W. 1094; State v. Olson, 26 N. D. 304, — L.R.A.(N.S.) —, 144 N. W. 661, 13 Columbia L. Rev. 667.  The trend of authority in the United States, indeed, is undoubtedly in support of the proposition that the main question for the courts to determine is whether the subject-matter is one over which the legislature can exercise a supervisory control, and that the questions of method and of exigency are questions which must generally be left for the legislative bodies to decide.  If a regulation is within the scope of the legislative power and its purpose is not arbitrary supervision, but the protection of the public, the mere fact that it may be unwise in the opinion of the courts or involve an added expense upon the consuming public is no justification for judicial interference.  The main arguments against the provisions of the statute which are now under consideration are that their enforcement might possibly prevent the sale of lard in packages in the state of North Dakota, or might so increase the cost of manufacture that an added price would have to be paid by the consumer.  These matters, however, are for legislative, and not judicial, determination.  The legislature is drawn fresh from the people.  It has the power to appoint committees to examine and to investigate.  It and the governor, who has the power

to veto and to prevent the passage of unpopular and unsocial legislation, have determined that the rest of this added expense shall be run, and have determined that the prevention of fraud and of short weights is at the present time the paramount necessity. It is too late to contend that the legislature in the proper case has not the power to provide for the size of packages when that size may have a tendency to prevent a deception in weight. ( See cases on size and weight of packages and of bread, etc., cited in the principal opinion.)

The reasoning of counsel for respondent may not appear conclusive to this court, but we cannot say that the legislature was not justified in considering it to be so. "Lard," says counsel for the state, "is a household necessity which is largely used in cooking and baking, and, for convenience in handling, as well as for other reasons, it has become a universal and extensive practice to pack lard for sale in pails or containers of convenient size for meeting the requirements of the ordinary householder buying lard. These pails have acquired by usage the designation of 3-pound pails, 5-pound pails, and 10-pound pails. The actual net weight of lard they contain depends upon the whim of the manufacturer. The actual amount of lard in these several pails put up by the defendant is as follows: In 3-pound pail 2 pounds, 6 ounces of lard; in the 5-pound pail 4 pounds, 2 ounces of lard; in the 10-pound pail 8 pounds, 10 ounces of lard. In the mind of the average buyer, however, the pail contains the number of pounds of lard which its name implies; that is, the 3-pound pail represents 3 pounds, the 5-pound paid represents 5 pounds, etc. In the absence of any law requiring the net weight of the commodity to be disclosed, the manufacturer or merchant has the opportunity to actually and even wilfully deceive as to the actual contents of the package. He may reduce the net weight of the lard, or increase the weight of the package; and unless the container is opened and the contents actually weighed, the consumer must depend upon the representations of the maker or merchant as to the real amount of lard he is getting. In actual practice the representations of the maker or merchant are accepted and acted upon by the general run of consumers. Nay more—the popular conception as to the quantity of lard is the conception accepted and acted upon by the ordinary buyer; and the maker and merchant can merely tacitly adopt the popular conception, and profit accordingly at the expense of the

buying public. In short, they can take advantage of the popular conception as to the quantity of lard, and thereby collect without the buyers' actual knowledge the same price for the weight of the package as they get for the contents. As a result of this practice the buying public not only may but actually have been paying large sums for tin and packing which they would not have paid had their attention been specifically directed to what they were doing. . . . Labels disclosing the net weight are not effective in actual practice, because the popular designation of a package will continue to prevail in spite of labels. Then, too, labels are oftentimes and in fact generally are unheeded. The ignorant heed them not because they do not understand them. The busy housewife as a rule does not notice them. Then, also, labels are easily removed or displaced either by intention or design. . . . The only safeguard to insure the effectiveness of such a law is to standardize the package; that is, to make the net contents correspond with the popular designation of the package. . . . The reason for not permitting fractions of a pound is obvious. If fractions of a pound were permitted, the difference between the size and appearance of two pails of different weights would not be readily discoverable, and hence deception and misrepresentation would be greatly facilitated. For example: It would be difficult without careful examination to see the difference between $2\frac{1}{2}$-pound pail and a 3-pound pail." These reasons may not appear conclusive to the court, but we cannot say that the legislature was without reason in considering them.

Nor, too, is there any force in the contention that the statute in question is in derogation of the interstate powers of the Federal Congress. The most recent cases upon the subject, and upon which counsel for the defendants principally rely (Savage v. Jones, 225 U. S. 501, 56 L. ed. 1182, 32 Sup. Ct. Rep. 715; and McDermott v. Wisconsin, 228 U. S. 115, 57 L. ed. 754, 47 L.R.A.(N.S.) 984, 33 Sup. Ct. Rep. 431) make it clearly appear that the mere fact that Congress may have passed a so-called food and drugs act has not tied the hands of the state in the case in question. State statutes in such cases are only invalidated where they interfere with or frustrate the operation of the acts of Congress. It cannot be said that the act in question does this. It is merely supplementary thereto. All that the act of Congress says is that if the weight of the package is given upon the label it shall be the

correct weight. The cases of Savage v. Jones, and McDermott v. Wisconsin, in fact, are authorities for, and not against, the state in this case. It is true that in the latter case, the statute of Wisconsin was held invalid; but the statute of Wisconsin forbade the use of the Federal label altogether. Federal regulations of interstate commerce have perhaps been widely extended, but we do not believe that the courts have yet construed the power so as to take from the states the inherent right of self-protection; nor can we believe that it was ever intended by the framers of our government that the protection of the people of a state from fraud and adulteration should be dependent upon the whim of a Federal Congress, located thousands of miles away, with no knowledge of local conditions, and located in what the late Justice David J. Brewer has termed the "lobby camp of the world." It also appears to me that in the case at bar the question of interstate commerce is not really involved, as the original package seems to have been broken.

Fisk, J. (dissenting). I cannot concur in the conclusions reached by the majority. Much that is said in the majority opinion concerning abstract propositions of law is concededly correct and no longer open to debate in the courts. Indeed, counsel in the case at bar do not disagree in the least upon those fundamental and well-settled rules; nor do they seriously differ in any respect other than in the application of such rules to the case in hand. I take it for granted that all must agree that, in its exercise of the so-called police power of the state, the legislature does not have absolutely a free hand, but is restricted by certain constitutional limitations, and that it is the solemn duty of the courts, when called upon so to do, to uphold such constitutional limitations by pronouncing any act null and void which plainly transgresses them. Instead of the legislature being the exclusive judges, it is for the courts to determine whether an attempted exercise of such police power is necessary for the public welfare, or whether it is a mere arbitrarily, unnecessary, and capricious interference with the legitimate business of the citizen.

I am, therefore, unwilling to sanction the doctrine that because Professor Ladd, who concededly stands high in the public estimation as an expert on pure foods and pure drugs, drafted the bill which finally became the act in question, and that such legislation successfully found

its way upon our statute books through the friendly offices of both the legislative and executive departments of the state, that this gives it a *carte blanche* which the courts are in duty bound to respect. If such a doctrine is to receive the sanction of the courts, I fear. that serious consequences may result, even through the best of intentions on the part of such distinguished experts as Professor Ladd, although in good faith sanctioned by legislative and executive authority. That such doctrine is not the law, I think the courts have spoken in no uncertain language. A mere statement of the proposition ought to suffice to disclose its fallacy. In support of my position I deem it entirely useless to do more than refer to a few expressions of the courts and law writers upon the question.

The supreme court of Illinois has said: "When the police power is asserted for the purpose of regulating a useful business or occupation and the mode in which that business may be carried on or advertised, the legislature is not the exclusive judge as to what is a reasonable and just restraint upon the constitutional right of the citizen to pursue his calling and to exercise his own judgment as to the manner of conducting it." Ruhstrat v. People, 185 Ill. 133, 49 L.R.A. 181, 76 Am. St. Rep. 30, 57 N. E. 41, 12 Am. Crim. Rep. 453, and cases cited.

The United States Supreme Court in Lawton v. Steele, 152 U. S. 133, 38 L. ed. 385, 14 Sup. Ct. Rep. 499, in speaking upon this subject through Mr. Justice Brown, said: "To justify the state in thus interposing its authority in behalf of the public, it must appear, first, that. the interests of the public generally as distinguished from those of a particular class require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations. In other words, its determination as to what is a proper exercise of its police powers is not final or conclusive, but is subject to the supervision of the courts."

As is very aptly stated by Freund on Police Power, § 494: "To prevent an abuse of the police power for the alleged protection of health or safety, or the alleged prevention of fraud, the courts must be allowed to judge whether restrictive measures have really these ends in view. A

27 N. D.—14.

remote and slight danger should not be recognized as a sufficient ground of restriction, and the provisions of the law should be scrutinized in order to see whether they in reality tend to effectuate their object."

Upon the question of the police power of a state and the restrictions upon its exercise, Marshall, J., in speaking for the supreme court of Wisconsin in a recent case, very exhaustively and accurately stated what I deem to be sound. Among other things, he said:

"It is conceded that the legislation in question was an attempt to exercise the police power of the state, which is inherent in sovereign authority under such limitations as exist in the national and state Constitutions, and that if as a police regulation it is not legitimate, it is not the law though possessing the form thereof. A legislative enactment approved by the executive, and duly published, is not necessarily a law or binding on anyone in respect to his liberty, his business, or his property. It is such if it is susceptible of passing the judicial test of whether it is warranted by the fundamental law, which our constitutional system contemplates may be applied to all such enactments. Perhaps the thought sometimes expressed that the vital feature suggested, which every good law must possess, is not as fully appreciated by the lawmaking power as it ought to be, leading to infractions of some express limitation as well as that broad general restriction of legislative power contained in the declaration that 'all men are born equally free and independent, and have certain inherent rights; among these are life, liberty, and the pursuit of happiness; to secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed.'

Too much dignity cannot well be given to that declaration. That it was intended to cover a broad field not practicable to circumscribe by any specific limitation or limitations cannot well be doubted. This court has given thereto its proper place in unmistakable language, particularly in recent decisions. Durkee v. Janesville, 28 Wis. 464, 471, 9 Am. Rep. 500; State ex rel. Adams v. Burdge, 95 Wis. 390, 37 L.R.A. 157, 60 Am. St. Rep. 123, 70 N. W. 347; State ex rel. Kellogg v. Currens, 111 Wis. 431, 435, 56 L.R.A. 252, 87 N. W. 561; State ex rel. Zillmer v. Kreutzberg, 114 Wis. 530, 58 L.R.A. 748, 91 Am. St. Rep. 934, 90 N. W. 1098; State ex rel. Jones v. Froehlich, 115 Wis. 32, 42, 58 L.R.A. 757, 95 Am. St. Rep. 894, 91 N. W. 115; State ex rel. Mil-

waukee Medical College v. Chittenden, 127 Wis. 468, 521, 107 N. W. 500. Doubtless the fathers of the Constitution foresaw the likelihood and danger of the security of personal rights, which the fundamental law was intended to firmly intrench with the judiciary as its efficient defender, being jeopardized at times by excessive regulation of the ordinary affairs of life, and, with that in view, incorporated in the fundamental law at § 22, article 1, that admonition so full of meaning: 'The blessings of a free government can only be maintained by a firm adherence to justice, moderation, temperance, frugality, and virtue, and by frequent recurrence to fundamental principles.'

The idea is found expressed now and then, that the police power is something not dealt with or affected by the Constitution, at least in any marked degree, which is a mistake hardly excusable. The error suggested here and there, that the police power is 'a sovereign power in the state, to be exercised by the legislature, which is outside, and in a sense above, the Constitution (Donnelly v. Decker, 58 Wis. 461, 46 Am. Rep. 637, 17 N. W. 389, or that a police regulation which is clearly a violation of express constitutional inhibition is legitimate, subject to a judicial test as to reasonableness. . . . (Tiedeman, State & Federal Control of Persons & Property, § 3), or that no police regulation, not condemned by some express constitutional prohibition, is illegitimate, or that legislation not so condemned is legitimate if the lawmaking power so wills, though it violates some fundamental principles of justice, or that the reasonableness of a police regulation, and whether it unjustly deprives the citizen of natural rights, is wholly of legislative concern (Hedderich v. State, 101 Ind. 564, 51 Am. Rep. 768, 1 N. E. 47), and others of a similar character now and then found in legal opinions and text-books, are highly misleading' and have been distinctly discarded by this court. State ex rel. Milwaukee Medical College v. Chittenden, supra. As was there said, 'If it were true that all police regulations are legitimate which are reasonable, and all are reasonable which the legislature so wills, the Constitution as to very much of the field of civil government would be of no use whatever. The contrary has been the rule without any legitimate question since Marbury v. Madison, 1 Cranch, 137, 2 L. ed. 60.'

"The following significant expressions of this court as to the consti-

tutional limitations in the exercise of the police power leave nothing further to be said on the subject:

'As the police power imposes restrictions and burdens upon the natural and private rights of individuals, it necessarily depends upon the law for its support; and, although of comprehensive and far-reaching character, it is subject to constitutional restrictions. . . .' State ex rel. Adams v. Burdge, 95 Wis. 390, 398, 37 L.R.A. 157, 60 Am. St. Rep. 123, 70 N. W. 347, 349." State v. Redmon, 134 Wis. 89, 14 L.R.A.(N.S.) 229, 126 Am. St. Rep. 1003, 114 N. W. 137, 15 Ann. Cas. 408.

Judge Marshall, in the above case, defines the term "police power" as "the power to make all laws which in contemplation of the Constitution promote the public welfare." And he says "that both defines the power and states the limitations upon its exercise, it being understood that it is a judicial function to determine the proper subject to be dealt with, and that it is a legislative function, primarily, to determine the manner of dealing therewith, *but ultimately a judicial one to determine whether such manner of dealing so passes the boundaries of reason as to overstep some constitutional limitation, express or implied.* This court, in common with others, has said that the police power extends to legislation, regulating, reasonably—that is, to an extent not entering the realms of the destructive—all matters appertaining to the lives, limbs, health, comfort, good morals, peace, and safety of society. . . .

As it is a judicial function to define the proper subjects for the exercise of police power (Lake View v. Rose Hill Cemetery Co. 70 Ill. 191, 22 Am. Rep. 71), it must be to decide, as to any enactment, whether it really relates to a legitimate subject, or under the guise of doing so violates rights of persons or property. The idea that all legislation is within the police power which the lawmaking authority determines to be so, and that all which might be within such power is within it if the legislature so determines, is, as we have seen, a heresy, and one which was repudiated sufficiently for all time by the early decision, heretofore referred to, in Marbury v. Madison, supra, the American classic which first and conclusively defined the general character of the constitutional limitations and the relations of the legislature and the judiciary thereto and to each other. The doctrine there laid down

more than a century ago in the unanswerable logic of Chief Justice Marshall has never been departed from, except accidentally, inconsiderately, or ignorantly.

These words of the Supreme Court of the United States, speaking by Mr. Justice Harlan, in Mugler v. Kansas, 123 U. S. 623, 661, 31 L. ed. 205, 210, 8 Sup. Ct. Rep. 273, 297, express in a different form the spirit of the opinion in Marbury v. Madison, supra:

'The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty—indeed, are under a solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.'    .  .  .
It is not every enactment which will, to some extent, promote the public health, comfort, or convenience, which is legitimate. Otherwise the way would be open for legislative interference with the ordinary affairs of life to an extent destructive of many of the most valuable purposes of civil government. An expert on sanitation, or one on the manner of living best calculated to promote long and enjoyable life, who has become an enthusiast in his special study of the matter, could doubtless suggest a multitude of really, or apparently, good rules to be followed; the temperature of the air of sleeping rooms, the proper size of the rooms as regards the number of occupants, the arrangements for frequently changing the air by displacing that within for that without the habitation, the hours for sleeping, for retiring, and for arising, the amount and kind of food to eat, the proper number of meals per day, the proper admixture of solids and liquids, and length of time for each meal, the amount and kind of exercise required, and other things too numerous to mention might be suggested for legislative interference, each with a provision for severe penalty for its violation, with a division of the penalty, perhaps, between the informer and the public, till one would be placed in such a strait-jacket, so to speak, that liberty and the pursuit of happiness, the incentive to industry, to the acquirement and enjoyment of property,—those things commonly sup-

posed to make a nation intelligent, progressive, prosperous, and great,—would be largely impaired and in some cases destroyed. That such an extreme would be regulation run mad, and is quite improbable, 'tis true, but it would be possible without limitations of some sort, if a police law be conclusively legitimate merely because it promotes, however trifling in degree, public health, comfort, or convenience."

That police regulations must bear the judicial test of reasonableness under the circumstances is well settled. Plessy v. Ferguson, 163 U. S. 537, 41 L. ed. 256, 16 Sup. Ct. Rep. 1138; Rideout v. Knox, 148 Mass. 368, 2 L.R.A. 81, 12 Am. St. Rep. 560, 19 N. E. 390.

The highest court in our land in the recent case of Lochner v. New York, 198 U. S. 45, 49 L. ed. 937, 25 Sup. Ct. Rep. 539, 3 Ann. Cas. 1133, announced the principle that the individual right to make contracts in relation to business is a part of that liberty protected by the Constitution. The court there fully vindicates the right of the individual to freedom in the conduct of any legitimate business and his right to make contracts accordingly.

The New York court of appeals in the recent case of Schnaier v. Navarre Hotel & Importation Co. 182 N. Y. 83, 70 L.R.A. 722, 108 Am. St. Rep. 790, 74 N. E. 561, announced a principle in harmony with the foregoing. In condemning as unconstitutional a statute requiring that every employing or master plumber shall be registered and hold a certificate of competency from the examining board of plumbers of the city, the court said: "It is not within any reasonable or proper exercise of the police power, since a provision for the registration of the firm as such, or for the registration of one or more members of the firm who were skilled plumbers to act for the firm, would be a sufficient protection to the public from all the dangers that the legislation was supposed to prevent or mitigate."

According to the reasoning of the majority opinion in the case at bar, as I construe it, the question of the sufficiency of the protection afforded the public under the facts in the New York case would be held a legislative, and not a judicial, question.

With these preliminary observations and the foregoing well-entrenched rules as to the limits controlling the legislative exercise of the police power in mind, I approach a consideration of the act in question, which is chapter 236, Laws 1911.

Such act purports to regulate "weights, measures, and count of food products." Section 2 reads: "Every lot of lard or lard compound or of lard substitute, unless sold in bulk, shall be put up in pails or other containers holding one (1), three (3), or five (5) pounds net weight, or some whole multiple of these numbers, and not any fractions thereof. If the container be found deficient in weight, additional lard, compound, or substitute shall be furnished to the purchaser to make up the legal weight. The face label shall show the true name and grade of the product, the true net weight, together with the true name and address of the producer or jobber. . . ."

Appellant was informed against and convicted for selling to one E. F. Ladd "a quantity of lard, and not in bulk, which said lard was then and there put up, sold, and delivered to said E. F. Ladd in a pail which then and there held more than 2 pounds and less than 3 pounds net weight of lard, to wit, 2 pounds and 6 ounces of lard, and which said pail or container did not then and there have or display on the face label thereof the true net weight of said lard in even pounds or whole multiples thereof, but expressed the weight of the lard in pounds and ounces." The quotation is taken from the information, and it should be noted that the only complaint is that the pail did not contain even pounds, it being expressly alleged that the true net weight was stated on the face label thereof in pounds and ounces. Defendant appeals from the judgment of conviction.

The statute is assailed as unconstitutional upon various grounds, but two of which I need notice.

Appellant contends that the act complained of is unnecessary, unreasonable, arbitrary, and capricious as applied to the lard industry at the date of the passage of the act; and as a side-light to show the correctness of such contentions it offered at the trial a large mass of testimony showing the growth and development of the lard industry, the business methods in vogue in the conduct of such industry at the date the act was passed, and also showing the effect of such act upon this industry. Such testimony is uncontradicted, and while the same is not necessarily of controlling or any particular weight in determining the constitutionality of the law in question, I here give space to the following summary of such testimony as stated in appellant's brief:

"Lard is not used as a food by itself, but only in the preparation of

foods. It is a pastry shortening and cooking fat. It bears the same general relation to foods in the domestic economy as seasoning or spices, on the one hand, and butter and oils, on the other. The original shortening and cooking facts were vegetable products, notably olive oil, cocoanut oil, peanut oil, and a considerable number of other similar vegetable oils. Indeed these oils have all along been used in large quantities for these purposes. To them should be added cotton-seed oil, which is one of the most popular and commonly used shortening products at the present time. By a process of hardening and bleaching these oils have the general appearance and consistency of lard, and are put up in pails of similar size and shape.

"Aside from the production of lard in the home and retail market, the principal source of supply is the packing establishments. In these establishments lard is a by-product, utilizing the fat of the hog remaining after taking away the portions that commonly go into hams, bacon, pork loins, and pork sides. The relative proportion of lard from these various sources at present sold in North Dakota has been estimated at 40 per cent produced by local meat markets, 20 per cent by consumers, and 40 per cent by packing establishments.

"Originally lard was sold only in tierces or tubs, a method of sale commonly referred to as in 'bulk,' but early in the industry there arose a demand for smaller packages of a size suitable for the consumer, and this demand has been supplied by lard in pails. The demand for this style of package began about the year 1880, and has grown until at the present time about 40 per cent of the lard sold by the defendant in the United States is put up in pails.

"The advantages of the handling of lard in pails are numerous to the manufacturer, dealer, and consumer; namely (a) the improved keeping and handling qualities of the article, both in the store and home; (b) the protection to the public against careless or dishonest tradesmen as to the quantity given; (c) the greatly improved sanitary condition of the product; (d) the preservation of its freshness, wholesomeness, and bright appearance, which qualities are largely lost by exposure to the atmosphere; and (e) the greater convenience to the merchant in that it is already weighed and put up, and to the housewife in that it is delivered in a suitable receptacle for keeping the product, which receptacle may be afterwards used for other purposes.

*"From the beginning of the industry lard in pails has always been sold in gross weight packages.* Manufacturers have always filled the packages to the full gross weight. There has been no disposition to give short weights.

"From the beginning the price has always been based upon the price of the same grade of bulk lard, to which has been added only the cost of the labor and material required to make this convenient and sanitary package."

Attention is called to the fact that for a great many years all products sold by weight in package form have been sold on the basis of gross weight, and that this is well understood by dealers, as well as by the public generally, and has been recognized as a legitimate business method, and counsel for appellant argue that the effect of the law in question strikes a blow at this long-established standard or method in the business world, and arbitrarily substitutes one heretofore unknown in the industry.

The evidence discloses that the appellant maintains packing establishments at numerous large centers throughout the country, at each of which points lard is prepared by it for the market. That defendant manufactures its own pails of tin of a specified weight and size, and that in such manufacture it has installed complicated machinery at great expense, and that the pails used by it at the time this prosecution was instituted consisted of twenty different styles and sizes, requiring an equipment of special material, machinery, and appliances at each of its plants for the different styles and sizes of such pails, and it offered expert testimony to show the expense which it would be put to in complying with the act in question in order to supply its North Dakota trade. It is, of course, perfectly apparent to anyone, and it needs no testimony to show, that to comply with this law the various lard manufacturers would be put to an enormous expense, which ultimately would have to be borne by the consumers of lard in this state. Such fact, however, is not a controlling consideration, but merely a sidelight tending for what it is worth to shed light upon the reasonableness or unreasonableness of the act in question. If the legislature in the enactment of such statute did not transcend the due exercise of its police powers, and if the act in no way infringes the mandates of the Federal or state Constitutions, then it is clearly our duty to uphold the same,

however onerous its provisions may prove to be, either to the manufacturers of lard or to the consumers thereof. This, of course, goes without saying, for it is elementary.

One of the crucial questions for determination is whether the provisions of the act requiring the pails to contain ."one (1), three (3), or five (5) pounds *net weight,* or some whole multiple of these numbers, and not any fractions thereof," is a reasonable, and not a purely arbitrary and capricious, requirement. Appellant does not question the power of the legislature to require the net weight of the article to be stated upon the outside of the wrapper or container, and whether appellant has complied with chapter 195, Session Laws of 1907, thus prescribing, as well as the other requirements of that law, in regard to the matters to be stated upon such wrapper, is not here in question. I do not think it can be successfully contended that the method thus universally in vogue in the lard industry at the time this law was enacted in any way tended to deceive or mislead the purchaser as to the weight and contents of the pails. It would seem clear, therefore, that there was and is no necessity or justification for that portion of the 1911 enactment here challenged. Will a package or pail of lard containing an *even* number of pounds (net weight) with a necessary gross weight somewhat larger, tend in any respect to protect the purchasers from fraud or deception to any greater degree than packages containing a net weight *in pounds and ounces,* when such net weight is plainly noted on the outside wrapper? Is it, in other words, within the proper exercise of the police power to prescribe that lard in pails cannot be sold except in certain designated quantities?

Again, is it within the legitimate exercise of legislative power to prescribe, as is attempted to be done in § 2 of the act, a different classification as to the lard industry from that prescribed for all other industries in §§ 1 and 3 thereof, the former relating generally to all articles of food and beverages, and the latter specifically relating to bread? By §§ 1 and 3 no restrictions whatever are placed upon the size of the packages. All food products, except lard, may be sold in any quantity, provided that the net weight of the contents of such packages, excluding the wrapper, is "stated in terms of pounds, ounces, and grains avoirdupois weight," or in case of articles sold by measure, is stated in "terms of gallons of 231 cubic inches or fractions thereof, as quarts,

pints, and ounces." And bread is authorized to be sold in whole, half, and quarter loaves, and, "when plainly labeled with the exact weight thereof," may be sold in any size or quantity. In other words, lard is singled out from among all the food products and beverages, and placed in a class by itself in so far as the quantity which may be sold in a package is concerned. Why the legislature deemed such a distinction necessary I am wholly at a loss to understand. Neither the majority of the court nor counsel for the state have advanced any reasonable explanation for such discrimination, and I am forced to the conclusion that the attempted classification rests upon no natural nor reasonable ground, but is manifestly purely arbitrary and capricious. This appears so palpable and self-evident to my mind after due reflection, that I have no hesitancy, for this reason alone, in pronouncing the act unconstitutional and void upon its face. In Millett v. People, 117 Ill. 294, 57 Am. Rep. 869, 7 N. E. 631, the court on this question said: "We recognize fully the right of the general assembly, . . . to prescribe weights and measures, and to enforce their use in proper cases; but we do not think that the general assembly has power to deny to persons in one kind of business the privilege to contract for labor and to sell their products without regard to weight, while at the same time allowing to persons in all other kinds of business this privilege, there being nothing in the business itself to distinguish it in this respect from any other kind of business."

As we have seen, the so-called police power of a state does not confer upon the legislature an absolutely free hand in prescribing rules and regulations of the character in question. Legitimate business transactions cannot be hampered or restricted or otherwise interfered with by the legislature, except to the extent reasonably required for the proper protection of the public interests or the public welfare. If the attempted police regulation clearly extends beyond the supposed threatened evil, and is manifestly capricious and wholly arbitrary, it, to that extent, constitutes an unwarranted interference with the rights of the citizens to contract, and it becomes the plain duty of the courts to interfere by adjudging such attempted regulation void.

The act in question deals confessedly with a legitimate trade industry, and the only possible justification for the attempted regulation is upon the ground that it is necessary to prevent fraud. But, as before

stated, I am wholly unable to perceive how the enforcement of such new statutory restriction will, or possibly can, operate in the least degree to this end. And moreover, conceding that it will to some slight degree thus operate, is this not manifestly true as to all other staple food products covered by the act? Is there, in the nature or character of the lard industry, anything to differentiate it in the manner here attempted from the many other food industries sufficient to warrant a special rule applicable alone to the former? I think not, and this unwarranted discrimination is alone sufficient to condemn the statute.

My attention has been called to no statute elsewhere under which such an exercise of the police power has been attempted by any legislature. A statute in Tennessee which was upheld by the supreme court of that state in the case of State v. Co-operative Store Co. 123 Tenn. 399, 131 S. W. 867, Ann. Cas. 1912C, 248, is the nearest like the act in question of any I have discovered. The statute there in question made it unlawful for any person "to pack for sale, sell, or offer for sale in this state any corn meal except in bags or packages containing by standard weight 2 bushels or 1 bushel or $\frac{1}{2}$ bushel or $\frac{1}{4}$ bushel or $\frac{1}{8}$ bushel respectively." Such act also provided that "each bag or package of corn meal shall have plainly printed or marked thereon, . . . the amount it contains in bushels or fraction of a bushel, and the weight in pounds: Provided, the provisions of this section shall not apply to the retailing of meal direct to consumers from bulk stock when priced and delivered by actual weight or measure." A violation thereof was made a misdemeanor. In sustaining the law against an attack upon the ground that it attempts to abridge the right of persons to contract, and deprives them of their liberty and property without due process of law, the court, among other things, said: "The object of this statute, is the prevention of fraud in the sale of one of the most common articles of commerce and food. *The fraudulent practice sought to be suppressed is the sale of packages of corn meal, purporting, expressly or by implication, to contain certain weights and measures for which the purchaser is charged, when in fact they contain less quantities,* whereby the public is deceived and defrauded to the extent of the deficiency in weight or measure of the package purchased. The prevention of fraud in general has always been recognized as well within the police power. Statutes enacted for this purpose, and which have a fair, just, and reasonable

relation to the preservation of the lives, health, morals, and general welfare of the public, do not contravene the constitutional provisions here relied upon, although they may interfere to some extent with individual liberty and the free use and enjoyment of private property."

I have no quarrel with the reasoning or conclusion of that able court in the light of the facts of that case, but the statute in the case at bar is plainly distinguishable from the Tennessee act in at least one important particular. At the time of the passage of the Tennessee law there was a well-recognized evil to be remedied. The act conclusively shows this by the language therein, "that whereas the practice in this state of putting up and selling meal in shortweight packages is against the public welfare and the interest of legitimate trade." The portion of the above-quoted opinion also expressly recognizes the existence of such fraudulent practice. It is to be noted, also, that the points that the act was an unnecessary and unreasonable exercise of the police power of the state, and that the same constituted an unwarranted discrimination and was class legislation, were not urged or raised by the defense. An entirely different situation is presented in the case at bar, as already observed. None of the numerous authorities cited and relied upon by the Tennessee court involved facts parallel with those in the case at bar, and I am satisfied that the North Dakota statute is, in the light of the undisputed facts, unique in the history of such legislation.

The contention that purchasers are or may be deceived in the quantity of lard purchased where the pails are not of the size prescribed in this act is, I think, not tenable; for, as above stated, the true net weight is required to be plainly stated on the outside wrapper of each pail. At least, this is all that in reason ought to be required in order to furnish such information, where, as appears here, no actual or attempted fraud or deception has ever been practised by the manufacturers or vendors of lard in this form. It is difficult to comprehend how such deception can occur to any appreciable extent, but if it does, how is the purchaser injured thereby when he gets all the lard which he pays for? The fact that he is, in addition, required to pay for the container and wrapper, and the added expense of putting it up in this sanitary form, affords no just ground for complaint, nor does it justify the act in question. This is true as to any sized pail, and is according to a long and well-

established general custom of the trade of which he is presumed to have knowledge.

In State v. Hanson, 118 Minn. 85, 40 L.R.A.(N.S.) 865, 136 N. W. 412, Ann. Cas. 1913E, 405, a statute providing in substance that no person, firm, or corporation shall manufacture or sell oleomargarine which shall be in imitation of butter of any shade or tint of yellow, unless such oleomargarine shall be made and kept free from all coloration or ingredients causing it to look like butter of any shade or tint of yellow, nor unless the same shall be kept and presented in a separate and distinct form, and in such manner as will advise the purchaser and consumer of its real character, was held unconstitutional for reasons therein stated. The decision is not particularly in point here, but I think certain reasoning in the opinion lends support to my views as above stated. I quote: "We construe the law, therefore, as making criminal the sale or manufacture of oleomargarine purposely made of any shade or tint of yellow, whether the tint or shade be dark yellow, golden, or light yellow. Even as so construed, § 1 of the law might be sustained as a valid exercise of the police power, if it made proof of an intent to deceive or defraud the purchaser or consumer essential to a conviction. And it would be immaterial that no artificial coloring was used, or that the product was entirely wholesome, was exactly like butter in taste, or was in fact butter. The purchaser is entitled to know what he is buying; and any law enacted to prevent fraud or deceit, and having any fair tendency in that direction, would be valid. But this law does not make the intent to deceive or defraud essential to a conviction of a violation of § 1. Intentionally making oleomargarine of a shade or tint of yellow is made criminal, without proof of an intent to deceive. This being so, the law cannot be sustained, unless there is a reasonable probability that the purchaser or consumer will be deceived by the yellow shade or tint into buying or eating oleomargarine, mistaking it for butter. . . . The power of the legislature to regulate its manufacture and sale rests, not upon the right to legislate in the interest of the public health, but upon the undoubted right to enact laws to protect the public against fraud and deception, to suppress false pretenses, and promote fair dealing in an article of food. But we are quite unable to perceive how there is any but a remote possibility of deceiving the purchaser or consumer by making oleomargarine imitate butter in color, whether

it be a conscious or accidental imitation.  The intent to make oleomargarine of a shade or tint of yellow by the selection of ingredients is no evidence of an intent to deceive either purchaser or consumer.  Oleomargarine is made to resemble butter of a yellow color, not to deceive anybody, but because the public buys the substitute if it has the yellow shade, but refuses to buy it if it has a light shade.  The intent is not to deceive the public, but to make an article which will find a market.  It seems clear, not only that there was no intent to defraud or deceive, but that the color of the product has, in view of the stringent provisions of the law that clearly tend to prevent deception, no fair tendency to make either purchaser or consumer mistake oleomargarine for butter."

The court then refers to the provisions of law relating to placards upon the tubs or packages in which it is exposed for sale, to the wrappers, stamped with the word "oleomargarine," in which the retail dealer is required to deliver it to the purchaser, and other like provisions and says: "It may be suggested that the guests of a private housekeeper have not this protection, or that store, hotel, or restaurant proprietors may not obey the law as to placards, or that a purchaser who cannot read may be deceived.  But, granting that there may be a few instances where, by mistake, the consumer may take into his system oleomargarine, when he thinks he is eating butter, does this furnish a ground upon which the legislature can prohibit the manufacture and sale of a perfectly wholesome and healthful article of food?  On the record before us, such a deception would be wholly without damage.  In its last analysis, it is a mere matter of sentiment."

In a prior portion of the opinion it is also said:  "There can be, however, no intent to deceive the purchaser or consumer, as the provisions of the law concerning labels on packages and wrappers are fully complied with.  It is utterly impossible for the purchaser to be deceived."

The majority opinion cites certain decisions upholding the validity of ordinances prescribing the weight of loaves of bread.  People v. Wagner, 86 Mich. 594, 13 L.R.A. 286, 24 Am. St. Rep. 141, 49 N. W. 609, is one of the cases cited, but I find in the opinion the following language, which serves to differentiate this case from the case at bar.  I quote: "Sales are invariably made in loaves of the size of 1, 2, or 4 pound packages, and the ordinance simply takes the usual and ordinary

package or loaves in which bread is made and fixes the standard of weight of each package. It does not prohibit the sale of bread by weight if it overruns, as it is claimed it sometimes does, nor does it prohibit the exaction of an increased price by reason of the additional weight. It does not prohibit the sale of a half or a quarter or any other fraction of a loaf."·

In the case at bar the undisputed proof shows a well-established custom in the lard industry to put lard up in pails of the size of 3, 5, 10, and 20 pounds *gross weight,* but containing a label showing their net weight. The legislature, therefore, by § 2 of the act in question, has not attempted to standardize these packages in accord with such general established custom, but it seeks to force a radical departure therefrom, without the least resulting benefit to anyone. It is to be observed that by § 1 the legislature has, on the contrary, recognized the existing general trade custom as to all other food products as to weight, measure, and numerical count.

I have examined the opinions in the other so-called bread cases relied on, and I think practically all, if not all, of them may be differentiated in like manner from the case at bar.

In this connection see Buffalo v. Collins Baking Co. 39 App. Div. 432, 57 N. Y. Supp. 347, where the court upheld the lower court's decision reported in 24 Misc. 745, 53 N. Y. Supp. 968, holding an ordinance fixing the weight of loaves of bread at not less than $1\frac{1}{2}$ pounds each, and prohibiting sales thereof in any other size, to be unconstitutional and void, under facts quite analogous to those in the case at bar, as an unreasonable exercise of the police power, and an unwarranted interference with the rights of persons engaged in a legitimate business. I think the reasoning and conclusion of the court are sound, both on principle and authority.

I think that the portion of the act here in question is unconstitutional, and that it is our plain duty to so decide.

In what I have above stated I do not wish to be understood as holding that this whole act is unconstitutional, but merely that portion of § 2 prescribing the sizes of the pails or packages. The objectionable feature may be eliminated without affecting the balance of the Act.

I think the judgment should be reversed.

SPALDING, Ch. J. I concur in the above.

## On Petition for Rehearing.

Appellant has filed a petition for rehearing, in which he complains that this court has not passed upon the sufficiency of the information. The court had received the impression that this was a friendly suit to determine the constitutionality of the 1911 law, and that no ruling was desired upon minor questions. However, we are and always have been satisfied that the amended information states an offense, and the demurrer was properly overruled.

The petition for rehearing also complains because the case of Mc Dermott v. Wisconsin, 228 U. S. 115, 57 L. ed. 754, 47 L.R.A.(N.S.) 984, 33 Sup. Ct. Rep. 431, was not discussed. This court believes that such decision is not in point. The gist of its ruling is that a state may not exercise its police power in intrastate matters in such a way that it in effect interferes with interstate commerce. The Illinois manufacturer wished to ship an article from Illinois to Wisconsin, and was obliged to use the United States label in order to cross the state line. The minute that he crossed the state line, the Wisconsin law required him to remove the United States label and substitute another. Thus the Wisconsin law, though pretending to regulate local commerce, in effect prohibited commerce from Illinois to Wisconsin. In the case at bar the only hardship imposed upon the foreign shipper is an increase in cost, according to its own evidence, of $1\frac{1}{2}$ cents per pound, upon its lard in pails. This additional expense likewise falls upon a local manufacturer, so that there is no descrimination against the shipper from another state.

We might also state that Professor Ladd knew the exact amount of lard that he was buying, and that he was not deceived in any manner by appellant. On the contrary all the evidence points to the conclusion that the sale, arrest, and nominal fine were pursuant to an understanding between the pure food commissioner and the defendant, in order that the law might be tested in the courts.

The petition for rehearing is denied. BURKE, BRUCE, Goss, JJ.